[No. S055144. Aug. 27, 1998.]

QUELIMANE COMPANY, INC., et al., Plaintiffs and Appellants, v. STEWART TITLE GUARANTY COMPANY et al., Defendants and Respondents.

**COUNSEL**

Steve White, H. Peter Young, Judith A. Routledge, Rastegar & Matern and Dennis Wilson for Plaintiffs and Appellants.

Levinson, Lieberman & Snyder, Levinson, Lieberman & Maas, Peter M. Hebert, Burton S. Levinson and Lawrence R. Lieberman for Defendants and Respondents.

Horvitz & Levy, Lisa Perrochet, David M. Axelrad, Heller, Ehrman, White & McAuliffe, Paul Alexander, Vanessa Wells, Greines, Martin, Stein & Richland, Robin Meadow and Feris M. Greenberger as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**BAXTER, J.**—In this case we are again called upon to construe and apply the unfair competition law (UCL). (Bus. & Prof. Code, §§ 17200-17209.)[1] The principal question here is whether the Insurance Code displaces the UCL and provides the only remedies for plaintiffs who have been harmed by an alleged conspiracy among title insurers to refuse to sell title insurance on real property acquired at a tax sale.

We conclude that the Insurance Code does not displace the UCL except as to title insurance company activities related to rate setting. We shall reverse the judgment of the Court of Appeal which reached a contrary conclusion.

---

[1]Unless otherwise indicated, all statutory references are to the Business and Professions Code.

I

BACKGROUND

Although plaintiffs' first amended complaint set out seven causes of action against several defendants, only those in which First American Title Insurance Co. (First American) is a defendant are in issue here. Defendants Stewart Title Guaranty Company (Stewart Title) and Placer Title Company (Placer Title) have been dismissed from the action, without prejudice, by stipulation.[2]

In the allegations[3] in support of the first and second, which incorporates the first, causes of action, the first amended complaint alleges the following:

Plaintiffs Quelimane Company, Inc., Mannix Investments, Inc. (doing business as Western Land Bank Auctions), Western Land Capital Co., Port Kendall, Inc., and Western Land Bank, Inc., are engaged in the holding, ownership, and financing of real property. All have purchased properties at tax sales in El Dorado County.

Stewart Title, Placer Title, and First American are the only companies offering title insurance in El Dorado County.[4] All are subject to provisions of the Insurance Code and regulations of the California Department of Insurance.

---

[2]The complaint identified these causes of action as (1) interference by defendants Stewart Title and Placer Title with contractual relations with land purchasers Naina and Fathima Rahman; (2) violation of section 17200 by defendants First American, Placer Title, and Stewart Title; (3) slander of title against Stewart Title and Placer Title; (4) intentional misrepresentation by Stewart Title and Placer Title; (5) negligence against First American, Stewart Title, and Placer Title; (6) negligence against Stewart Title and Placer Title; (7) petition to vacate arbitration award (to the Rahman defendants).

The Rahmans' separate petition to confirm the arbitration award was denied without prejudice, the two matters treated as related cases. This complaint was dismissed as to them after their statute of limitations demurrer to what was the fifth cause of action in the original complaint was sustained. The Court of Appeal affirmed the judgment in their favor and it is not in issue here.

[3]This matter arises on appeal from a judgment of dismissal entered after the superior court sustained demurrers to plaintiffs' complaint. "[A]t this early stage of the lawsuit, this court, like the Court of Appeal, is obliged to accept as true all well-pleaded allegations of the complaint for the purpose of assessing its sufficiency to withstand a demurrer. Whether additional pretrial procedures designed to go behind the face of the complaint and expose meritless claims will be successful in this matter is a question we have no occasion to consider given the posture of this case." (*General Dynamics Corp.* v. *Superior Court* (1994) 7 Cal.4th 1164, 1171, fn. 1 [32 Cal.Rptr.2d 1, 876 P.2d 487]; see also *Lazar* v. *Superior Court* (1996) 12 Cal.4th 631, 635 [49 Cal.Rptr.2d 377, 909 P.2d 981].)

[4]"Title insurance means insuring, guaranteeing or indemnifying owners of real or personal property or the holders of liens or encumbrances thereon or others interested therein against loss or damage suffered by reason of:

On September 8, 1991, Western Land Bank sold at auction a parcel of El Dorado County real estate to Naina and Fathima Rahman. Title to the property was then in plaintiff Port Kendall, Inc., which had acquired it by tax deed more than one year before the auction sale at which the Rahmans purchased the property. The contract gave the purchasers the option of acquiring title insurance at their own expense. The purchasers were unable to secure title insurance from Placer Title and Stewart Title, which intentionally refused to issue a policy of title insurance. The Rahmans instituted mediation proceedings as provided in their contract of sale and sought rescission of the land sale contract.

Placer Title and Stewart Title knew, and prior to the purchase by the Rahmans, Placer Title had issued a preliminary title report to the Rahmans stating that the land was unencumbered by any trust deed or claim of ownership by any party other than the seller. Placer Title had also issued a written report declaring readiness to issue a title insurance policy on the parcel.

On September 20, 1992, Western Land Bank sold to SAR at auction two lots in El Dorado County that the seller had acquired at a tax sale. Placer Title and Stewart Title each informed SAR that the lots were uninsurable and therefore unmarketable. They refused to issue title insurance on the property. At the time they did this, these defendants knew there was no cloud on the seller's title, and that any possible clouds on title had been nullified by operation of law one year after the seller took title by tax sale.

On February 10, 1991, Robert Constant agreed to purchase at a Western Land Bank auction a parcel of Fresno County realty. Western Land Bank had acquired the property by tax deed. First American issued a commitment for title insurance on the property, but conditioned it on commencement of a quiet title action. Because First American refused to issue the policy without a quiet title action, Constant did not complete payment for the property.

The complaint also alleged that defendants engaged in a practice of interfering with land sale contracts by refusing to issue title insurance on parcels purchased by tax sale in which title was deeded free and clear by operation of law. Defendants were aware that ability to obtain title insurance is an important part of any real estate transaction in California and had individually and jointly undertaken marketing programs stressing the necessity of such insurance, attempting to convince members of the general public

"(a) Liens or encumbrances on, or defects in the title to said property;
"(b) Invalidity or unenforceability of any liens or encumbrances thereon; or
"(c) Incorrectness of searches relating to the title to real or personal property." (Ins. Code, §§ 104, 12340.1.)

that the insurance is essential to protect purchasers. Defendants had represented to the public that they would insure any real estate that had good title.

Based on these allegations the complaint asserted interference by Stewart Title and Placer Title with contractual relations of plaintiffs with Rahman, SAR, and Constant; conspiracy among defendants to refuse to issue title insurance policies on real property obtained pursuant to a tax sale; and intentional, willful and deliberate interference by all defendants with contractual relations of members of the general public for the sale of land purchased through tax sales.

The second cause of action restated some of the above allegations and also alleged that defendants had agreed among themselves to "redline" all property acquired by tax sale, had engaged in a scheme to deny title insurance to parcels of land purchased at a land auction when the seller of the parcels had acquired title at a tax sale, and had conspired together to deny title insurance to property obtained by tax sale. It also asserted that, by agreeing to refuse to issue title insurance to such property while making efforts to convince members of the public that title insurance was necessary, defendants had manipulated the market in the El Dorado County area in which they were the only title insurers. This cause of action asserted that in the three specific sales described in the first cause of action, defendants had engaged in unlawful, unfair and fraudulent business practices, conduct that constitutes an unfair business practice as the term is used in section 17200, and that the conduct described in the second cause of action also constituted an unfair business practice. Defendants allegedly engaged in this conduct without economic, actuarial, or other justification.

As a result of defendants' conduct the value of plaintiffs' land is greatly reduced in value and is difficult to market, and plaintiffs are unable to transfer title to some real estate they own.

The fifth cause of action, for negligence, alleges that defendants had a duty to members of the general public to issue title insurance to any parcel of land without discrimination, to report the legal status of the title of any parcel and to use known and accepted legal, actuarial, and statutory criteria to determine the legal status of land. It alleges they breached that duty by failing to insure title to any parcel purchased by tax sale regardless of the merits of the chain of title.

First American demurred to the first, second and fifth causes of action for the reason that each failed to state facts sufficient to constitute a cause of action. (Code Civ. Proc., § 430.10, subd. (e).) The demurrer was sustained as

to all causes of action against First American without leave to amend and judgment was entered for First American.

Plaintiffs appealed, arguing that they had sufficiently pled causes of action for interference with contract, violation of section 17200, and breach of a duty to issue title insurance policies without discrimination, and that, if not, leave to amend should have been granted. The Court of Appeal disagreed and affirmed the judgment for defendant First American.

Relying in part on *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393 [45 Cal.Rptr.2d 436, 902 P.2d 740], the Court of Appeal held that the allegations did not state a cause of action for intentional interference with contractual relations because First American's refusal to issue title insurance was not wrongful for a reason other than the impact on the plaintiffs' contracts with the Rahmans and SAR. The court reasoned that no law or administrative regulation prohibits title insurers from denying a policy. The allegation of a conspiracy did not overcome the absence of any obligation to issue title insurance.

The court noted that *Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34 [172 P.2d 867] held that concerted activities for an unlawful purpose such as activities in restraint of trade could form the basis of a cause of action for interference with contractual relations. However, believing that *Manufacturers Life Ins. Co.* v. *Superior Court* (1995) 10 Cal.4th 257, 267 [41 Cal.Rptr.2d 220, 895 P.2d 56] (*Manufacturers Life*) supported its conclusion, the court held that the Insurance Code, and in particular Insurance Code section 12414.26, now limits actions against insurers for unlawful business practices to the remedies provided in that code, displacing other existing rights and remedies for unlawful business practices in the insurance industry, including the Cartwright Act. Furthermore, that court held, no common law theory of restraint of trade was available because illegality at common law rendered an agreement void and unenforceable, but did not afford a damages remedy. (*State of California* ex rel. *Van de Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147, 1167 [252 Cal.Rptr. 221, 762 P.2d 385].)

It followed, the Court of Appeal reasoned, that the second cause of action—for violation of section 17200—also failed to state a cause of action since the Legislature had not made section 17200 expressly applicable to insurers.

Finally, since there is no duty to issue a policy of title insurance, the allegations of the fifth cause of action failed to state a cause of action for negligence.

Plaintiffs contend that the Court of Appeal erred in concluding that title insurance companies are exempt from civil liability under laws prohibiting conduct in restraint of trade and unfair business practices notwithstanding concerted action to deny title insurance to an entire category of property. In the context of title insurance for property acquired at a tax sale, they argue, this result is contrary to a clear legislative policy that there be no extraordinary risks in acquiring such property that would affect its marketability.

First American counters that the lawsuit is an attempt to create as official public policy a mandate that a title insurer issue policies to properties with a tax sale deed in the chain of title even though they are unable through research to ascertain if the tax sale deed is valid. First American also argues, consistent with the reasoning of the Court of Appeal, that no private civil action may be brought on the basis of its refusal to issue title insurance on tax-defaulted property because Insurance Code section 12414.29 gives the Insurance Commissioner exclusive jurisdiction over the conduct of title insurers in title transactions. Further, defendant First American contends, relief must be denied here because, regardless of whether Insurance Code sections 12414.26 and 12414.29 preclude application of the Cartwright Act (§ 16700 et seq.) and the UCL (§ 17000 et seq.), it had valid reasons for conditioning the issuance of its policy and could justifiably condition the issuance on a quiet title action.

## II

### DISCUSSION

The rules by which the sufficiency of a complaint is tested against a general demurrer are well settled. We not only treat the demurrer as admitting all material facts properly pleaded, but also "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. (*Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 42 [172 P.2d 867].)" (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer. "[W]e are not limited to plaintiffs' theory of recovery in testing the sufficiency of their complaint against a demurrer, but instead must determine if the *factual* allegations of the complaint are adequate to state a cause of action under any legal theory. The courts of this state have . . . long since departed from holding a plaintiff

strictly to the 'form of action' he has pleaded and instead have adopted the more flexible approach of examining the facts alleged to determine if a demurrer should be sustained." (*Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 103 [101 Cal.Rptr. 745, 496 P.2d 817], original italics; *LiMandri* v. *Judkins* (1997) 52 Cal.App.4th 326, 339 [60 Cal.Rptr.2d 539].)

If a complaint does not state a cause of action, but there is a reasonable possibility that the defect can be cured by amendment, leave to amend must be granted. (*Blank* v. *Kirwan*, *supra*, 39 Cal.3d at p. 318.)

In this court plaintiffs do not contend that defendant's requirement of a quiet title action by Robert Constant as a condition to issuance of a policy of title insurance is itself unlawful and a basis for recovery under the UCL. They argue instead that they have sufficiently alleged a conspiracy among First American, Stewart Title, and Placer Title to refuse to issue title insurance on any tax-deeded property, among which was the Constant parcel. That conduct, they contend, is concerted action in restraint of trade which violates the Cartwright Act (§ 16700 et seq.) and thus is a recognized basis for a civil action for damages and other relief under the UCL.

### A. Tax Deeds.

At the outset we put the dispute in context. To determine whether the complaint states a cause of action under a theory of conspiracy in restraint of trade, it is helpful to understand the type of titles which defendants allegedly refuse to insure. The tax deed at the genesis of the action is the means by which property which has defaulted to the state for failure to pay assessed taxes is transferred to a private buyer. Revenue and Taxation Code section 3691 authorizes a tax collector to sell tax-defaulted property five or more years after the default. The owner's right to redeem the property terminates at the close of business on the last business day before the sale is set. (Rev. & Tax. Code, § 3707.)

Any person may purchase at a tax sale. The Revenue and Taxation Code spells out the procedures under which the sale is made, for giving notice prior to the sale, and for sharing of proceeds by taxing entities. (Rev. & Tax. Code, § 3691 et seq.) On receipt of the full purchase price the tax collector executes a deed to the purchaser. (Rev. & Tax. Code, § 3708.) This is the "tax-sale deed" (i.e., tax deed) to which plaintiffs refer in the complaint.

Except as against fraud, a tax deed is conclusive evidence that the proceedings from the assessment to the execution of the deed were regularly

performed. (Rev. & Tax. Code, § 3711.) With minor exceptions[5] the deed conveys title free of all encumbrances. (Rev. & Tax. Code, § 3712.)

A purchaser at a tax sale or other person in privity may bring a suit to quiet title to the property. (Rev. & Tax. Code, § 3727.)

While the validity of a tax deed may be challenged, "[a] proceeding based on alleged invalidity or irregularity of any proceedings instituted under [Revenue and Taxation Code section 3691 et seq.] can only be commenced within one year after the date of execution of the tax collector's deed." (Rev. & Tax. Code, § 3725.) Moreover, "[a] defense based on the alleged invalidity or irregularity of any proceeding instituted under [Revenue and Taxation Code section 3691] can be maintained only in a proceeding commenced within one year after the date of execution of the tax collector's deed." (Rev. & Tax. Code, § 3726.)

As the Court of Appeal explained in *Van Petten* v. *County of San Diego* (1995) 38 Cal.App.4th 43, 46 [44 Cal.Rptr.2d 816] (*Van Petten*): " 'A tax sale proceeding is wholly a creature of statute.' (*Craland, Inc.* v. *State of California* [(1989)] 214 Cal.App.3d [1400,] 1403 [263 Cal.Rptr. 255].) After a declaration of default with respect to real property which has become subject to a tax lien, 'the property becomes "tax-defaulted property." [Citations.] The five-year redemption period commences to run upon the declaration of default. [Citations.] [¶] The tax-defaulted property becomes subject to sale following the expiration of the redemption period, and a sale must be attempted within two years thereafter. [Citations.] The sale must first be approved by the county board of supervisors and the state controller. [Citation.]' (*Craland, Inc.* v. *State of California, supra*, 214 Cal.App.3d at p. 1404.) [¶] Property sold by public auction . . . goes to the highest bidder. [Citation.] The minimum purchase price is the 'total amount necessary to redeem [the property],' which is defined as the sum of the defaulted taxes, delinquent penalties and costs, redemption penalties and a redemption fee." (Fns. omitted.)

In *People* v. *Chambers* (1951) 37 Cal.2d 552, 561 [233 P.2d 557], this court held that where a tax statute provides a remedy, that remedy is exclusive. *Chambers* was followed in *Van Petten* and in *Craland, Inc.* v.

[5]Exceptions include special assessment installments due after the sale or which were not included in the amount fixed for presale redemption of the property; liens for taxes levied by any agency that has not consented to the sale; servitudes and water rights for which title is separately held; unaccepted, recorded, irrevocable offers of dedication to a public entity; recorded options of a taxing agency to purchase; federal tax liens; and unpaid taxes or assessments under the Improvement Bond Act of 1915 or Mello-Roos Community Facilities Act of 1982. (Rev. & Tax. Code, § 3712.)

*State of California* (1989) 214 Cal.App.3d 1400 [263 Cal.Rptr. 255] (*Cra-land*), where the Court of Appeal concluded that a purchaser at a tax sale is limited to the remedies provided by the Revenue and Taxation Code and has no right to common law remedies for defects in the tax sale proceeding. (*Van Petten, supra*, 38 Cal.App.4th at p. 51; *Craland, supra*, 214 Cal.App.3d at p. 1405; cf. *Schultz* v. *County of Contra Costa* (1984) 157 Cal.App.3d 242 [203 Cal.Rptr. 760].)

■■■ It is for this reason plaintiffs assert that defendants have no economic justification for refusing to issue title insurance to any purchaser of property which the seller acquired at a tax sale. As noted, defendant First American claims it is justified in refusing to issue title insurance or conditioning the issuance on prosecution of a quiet title action by the owner. Amicus curiae California Land Title Association (CLTA) also argues that such justification exists. It explains the reluctance to insure tax deed titles on the nature of title insurance which, it states, describes an interest in real property as of the date it is issued. ■■■ Title insurance, as opposed to other types of insurance, does not insure against future events. It is not forward looking. It insures against losses resulting from differences between the actual title and the record title as of the date title is insured. The policy does not guarantee the state of the title. Instead, it agrees to indemnify the insured for losses incurred as a result of defects in or encumbrances on the title. (*Karl* v. *Commonwealth Land Title Ins. Co.* (1993) 20 Cal.App.4th 972, 978-980 [24 Cal.Rptr.2d 912].)

A title insurer issues title insurance on the basis of, and in reliance on, the quality of its own investigation into instruments which, when recorded, impart constructive notice. Generally those records are public records concerning the status of the title. Potential risks not disclosed in public records are generally excluded from coverage. (See Cal. Title Insurance Practice (Cont.Ed.Bar 2d ed. 1977) §§ 6.34-6.54, pp. 143-156.) The degree of risk is therefore largely within the control of the insurer. ■■■ CLTA claims it has been the experience of the title insurance industry that tax deeds carry such a risk of unpredictable challenges by persons undisclosed by the title insurer's investigation that they have long been considered too speculative to insure. The risk exists because the statutory requirements governing tax sales require strict adherence to a complex series of procedures which, if not followed make the tax deed title vulnerable to attack. In the view of CLTA, "a judicial predilection" in favor of former owners of the property has led to invalidation of tax deeds on the basis of harmless procedural defects. CLTA therefore cautions its members in its manual that attacks on tax deeds are often successful. It advises its members that tax titles should never be insured simply because the insurer believes the title can be defended. The

title should be insured only if no defense of the title will be required, since the cost of the defense will be considerably more than the premium received for insuring the title. By declining this risk title insurance is made readily available and inexpensive.

Whether or not title insurers generally or defendant First American can justify participation in a conspiracy to refuse to insure title to tax-deeded property is not relevant at this stage of the proceedings, however. We do not foreclose the possibility that First American may be able to establish that legitimate business purposes support its refusal to insure titles derived from tax deeds and/or the alleged agreement among El Dorado County title insurance companies not to do so. Justification, however, is a defense to be raised at trial or on motion for summary judgment. In reviewing a dismissal following the sustaining of a demurrer, we address only the sufficiency of the complaint to state a cause of action.

After doing so, we conclude that the complaint does not state a cause of action for negligence, but the allegations are sufficient to state causes of action for unfair competition and intentional interference with contractual relations.

B. *The UCL.*

The UCL permits "any person acting for the interests of itself, its members or the general public" (§ 17204) to initiate an action for restitutionary and/or injunctive relief (§ 17203) against a person or business entity who has engaged in "any unlawful, unfair or fraudulent business act or practice [or] unfair, deceptive, untrue or misleading advertising [or] any act prohibited by Chapter 1 (commencing with Section 17500 [false advertising]) . . . ." (§ 17200.)

Because plaintiffs may prosecute a UCL action on behalf of the general public and need not have personally suffered damages,[6] defendant's argument that the allegations of the complaint fail to establish that it had a duty to issue a policy of title insurance to Constant does not compel a conclusion that the complaint fails to state a cause of action. If insurers are subject to the UCL and the complaint states a Cartwright Act violation, the complaint

---

[6]See, however, *Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 582-583 [71 Cal.Rptr.2d 731, 950 P.2d 1086] (conc. opn. of Baxter, J.).

is sufficient against defendant's demurrer. Moreover, fairly read,[7] the complaint alleges that the refusal to issue title insurance to Constant was a product of the alleged conspiracy in restraint of trade.

It is important to emphasize here that we agree with defendant First American, the Court of Appeal, and amici curiae CLTA and State Farm Insurance Companies on a major point. ■ An insurer does not have a duty to do business with or issue a policy of insurance to any applicant for insurance. Whether an insurer should be required to offer a particular class of insurance or insure particular risks are matters of complex economic policy entrusted to the Legislature. (*Wolfe* v. *State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554 [53 Cal.Rptr.2d 878].)

■ The claim made here, however, is that defendant First American conspired with other title insurance companies to deny title insurance on titles derived from tax deeds. The UCL cause of action is based on a theory that this conspiracy was unlawful and that the conspiracy is a basis for a UCL action.

We turn therefore to First American's argument that title insurers are not subject to the UCL. That question might appear to have been answered in *Manufacturers Life, supra,* 10 Cal.4th 257. The defendants in *Manufacturers Life* included insurance companies offering life insurance and insurance brokers, all of whom were subject to regulation under the Insurance Code by the Insurance Commissioner. There, too, the defendants argued that they were exempt from antitrust and unfair business practices legislation except to the extent that the Unfair Insurance Practices Act (UIPA) (Ins. Code, § 790.03) applied.

■ This court rejected that argument, holding that a UCL action against an insurer predicated on an alleged Cartwright Act violation could proceed even though the defendant's allegedly unlawful conduct was also a violation of the UIPA. Construing the UCL and UIPA, we expressly concluded that in adopting the UIPA the Legislature had not granted a general exemption from antitrust and unfair competition statutes. "Rather, the Legislature intended that rights and remedies available under those statutes were to be cumulative to the powers the Legislature granted to the Insurance Commissioner to enjoin future unlawful acts and impose sanctions in the form of license and certificate suspension or revocation when a member of the industry violates any applicable statute, rule, or regulation." (*Manufacturers Life, supra,* 10

---

[7]"In the construction of a pleading, for the purpose of determining its effect, its allegations must be liberally construed, with a view to substantial justice between the parties." (Code Civ. Proc., § 452.)

Cal.4th at p. 263; see also *Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc.*, *supra*, 17 Cal.4th at p. 565.) We observed that no court had accepted the argument that the UIPA exempted insurance companies from other state antitrust laws or from civil liability for anticompetitive conduct, and that in *Speegle* v. *Board of Fire Underwriters, supra*, 29 Cal.2d 34, 45-46, we had held that the industry is not exempt from Cartwright Act claims. (*Manufacturers Life, supra*, 10 Cal.4th at p. 279.)

■ The Court of Appeal concluded nonetheless that provisions of the Insurance Code specifically applicable to title insurers did create such an exemption. While noting that in Insurance Code section 12401 the Legislature had expressed its intent to "permit and encourage competition between persons or entities engaged in the business of title insurance," the court held that Insurance Code sections 12414.26 and 12414.29 precluded plaintiffs' action. We do not agree.

Insurance Code section 12414.26 provides: "No act done, action taken, or agreement made pursuant to the authority conferred by *Article 5.5* (commencing with Section 12401) or *Article 5.7* (commencing with Section 12402) of this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this state heretofore or hereafter enacted which does not specifically refer to insurance." (Italics added.)

Insurance Code section 12414.29 provides: "The administration and enforcement of *Article 5.5* (commencing with Section 12401) and *Article 5.7* (commencing with Section 12402) of this chapter shall be governed solely by the provisions of this chapter. Except as provided in this chapter, *no other law* relating to insurance and no other provisions in this code heretofore or hereafter enacted *shall apply to or be construed as supplementing or modifying the provisions of such articles* unless such other law or other provision expressly so provides and specifically refers to the sections of such articles which it intends to supplement or modify. The provisions of this chapter and regulations adopted pursuant thereto shall constitute the exclusive regulation of the conduct of escrow and title transactions by entities engaged in the business of title insurance as defined in Section 12340.3, notwithstanding any local regulation or ordinance." (Italics added.)

The scope of these sections is expressly limited to articles 5.5 and 5.7 of division 2, part 6, of the Insurance Code. Chapter 1 of part 6, commencing with Insurance Code section 12340, governs title insurance. Article 5.5 applies only to rate regulation, article 5.7 only to advisory organizations

which supply data related to ratemaking.[8] First American argues, however, that UCL actions against title insurers are precluded by the last sentence of section 12414.29, as the Legislature has provided there that the provisions of sections 12340 et seq. of the Insurance Code which govern title insurance are to be "the exclusive regulation of the conduct of escrow and title transactions by entities engaged in the business of title insurance . . . ." We disagree. First American's argument ignores the remainder of that sentence—"notwithstanding any local regulation or ordinance"—which makes it clear that the legislative purpose was to preempt local regulation, not to exempt title insurers from other state laws governing unfair business practices.

If there were any doubt about the purpose of that sentence, which was added to Insurance Code section 12414.29 by amendment in 1981 (Stats. 1981, ch. 479, § 5, p. 1820), the legislative history of the amendment dispels it. The Legislative Counsel's digest of the bill explained that the regulations in the chapter to which Insurance Code section 12414.29 refers (Ins. Code, div. 2, pt. 6, ch. 1) are exclusive to the exclusion of any local regulation or ordinance. (Legis. Counsel's Dig., Assem. Bill No. 691, 4 Stats. 1981 (Reg. Sess.) Summary Dig., p. 127.) The Assembly analysis is to the same effect, stating that the amendment was proposed by the Senate Insurance and Indemnity Committee to "make clear that the conduct of escrow and title transactions by title insurers is *solely* within the jurisdiction of state, not local regulation. The language contained in this bill preempting local regulation is similar to existing law regarding the licensing of production agencies." (Assem. analysis of Assem. Bill No. 691 (1981-1982 Reg. Sess.), original italics.)[9] It is clear, therefore, that Insurance Code section 12414.29 is not a statute which "expressly provide[s]" (§ 17205) that the UCL is

---

[8]An "advisory organization" is "a person or entity (other than a title insurer, underwritten title company, or controlled escrow company) which recommends or prepares policy forms or endorsements or procedural manuals (but not including the making of rates, rating plans, or rating systems), or which collects and furnishes to its members or insurance supervisory officials loss and expense statistics or other statistical information and data relating to the business of title insurance and who otherwise acts in an advisory, as distinguished from a ratemaking, capacity. No duly authorized attorney at law acting in the usual course of his profession nor any entity engaging in the above activity on a nationwide basis shall be deemed to be an advisory organization." (Ins. Code, § 12340.8.)

[9]Plaintiffs' request that the court take judicial notice of various materials assertedly related to the enactment of Insurance Code sections 12414.26 and 12414.29, supplied to counsel by the Legislative Intent Service is denied. The court will take judicial notice of the legislative history of a statute in order to ascertain the purpose of and meaning of an ambiguous statute. (See, e.g., *People* v. *Eubanks* (1996) 14 Cal.4th 580, 591 [59 Cal.Rptr.2d 200, 927 P.2d 310].) This includes reports of Senate and Assembly committees. (*People* v. *Cruz* (1996) 13 Cal.4th 764, 773-774, fn. 5 [55 Cal.Rptr.2d 117, 919 P.2d 731].) None of the materials submitted by plaintiffs are authenticated, however. (Evid. Code, §§ 1401, 1530.) Moreover, some of the documents are not materials shown to have been available to and presumably reviewed by the

inapplicable to the conduct of title insurers that is not related to ratemaking. Plaintiffs are not limited to the remedies set forth in the Insurance Code for the conduct alleged in this complaint.

The Court of Appeal did not consider the restriction to ratemaking-related activities in Insurance Code sections 12414.26 and 12414.29. It inadvertently relied instead on a statement in *Manufacturers Life, supra,* 10 Cal.4th at page 267, which described the opinion of the appellate court in that case and was not a holding of this court that section 12414.26 exempted title insurers from other laws unrelated to ratemaking. Neither title insurance nor the applicability of the UCL and Cartwright Act to title insurance was before this court in *Manufacturers Life.*

Indeed, in this court First American does not place principal reliance on the reasoning of the Court of Appeal. Instead, it first contends that the scope of the Cartwright Act and the UCL is not broad enough to encompass a claim like that made by plaintiffs. Were the court to conclude otherwise, it argues, we would usurp the power of the Legislature and create an untoward public policy mandating that title insurance companies issue policies even when they have determined that the risk is substantial. First American concedes that plaintiffs allege a conspiracy to deny title insurance when there is a tax deed in the chain of title and that other companies refused to issue title insurance policies, but claims that these allegations are inconsistent with allegations that First American agreed to issue a policy if a quiet title action was completed.

In a related argument, amicus curiae State Farm Insurance Companies argues that, because the potential scope of UCL liability is very broad, particularized fact-pleading should be required in UCL claims. Pleading specific facts rather than conclusory allegations is necessary, amicus curiae claims, both to give defendants notice of the theory on which plaintiff would hold them liable and to permit early disposition of factually unsupported actions. The potential for misuse of the UCL has not gone unnoticed. (See *Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc., supra,* 17 Cal.4th 553.) However, contrary to the suggestion by amicus curiae that the court may

---

Legislature when adoption of those statutes was under consideration. While the views of individual legislators as to the meaning of a statute rarely, if ever, are relevant, committee reports and analyses or digests of the Legislative Counsel are because it is reasonable to infer that all members of the Legislature considered them when voting on the proposed statute. (13 Cal.4th at pp. 773-774, fn. 5.)

A request for judicial notice of published material is unnecessary. Citation to the material is sufficient. (See *Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc., supra,* 17 Cal.4th 553, 571, fn. 9.) We therefore consider the request for judicial notice as a citation to those materials that are published.

require fact-specific pleading, the well-settled rule is otherwise except in pleading fraud.

■ In *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 216 [197 Cal.Rptr. 783, 673 P.2d 660], we applied the requirement of particularity in pleading a fraud cause of action. Under that rule, which is specific to fraud: " '(a) General pleading of the legal conclusion of "fraud" is insufficient; the facts constituting the fraud must be alleged. (b) Every element of the cause of action for fraud must be alleged in the proper manner (i.e., factually and specifically), and the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.' " (*Ibid.*) We also noted, however, that fraud is the only remaining cause of action in which specific pleading is required to enable the court to determine on the basis of the pleadings alone whether a foundation existed for the charge and, even in the pleading of fraud, the rule is relaxed when it is apparent from the allegations that the defendant necessarily possesses knowledge of the facts. (*Id.* at p. 217.)

■ In this cause of action, as in other nonfraud pleading, "[i]t is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading. [Citation.] It 'admits the truth of all material factual allegations in the complaint . . . ; the question of plaintiff's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court.' " (*Committee on Children's Television, Inc.* v. *General Foods Corp., supra*, 35 Cal.3d at pp. 213-214.)

■ State Farm Insurance Companies' particular concern is that the complaint fails to allege facts to support the claim that First American, Stewart Title, and Placer Title are "conspiring" and "have engaged in a general and concerted refusal to sell title insurance" or in a "group boycott." It argues that such general allegations should be deemed insufficient. Relying on *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 318 [70 Cal.Rptr. 849, 444 P.2d 481], it suggests that specific factual allegations in addition to pleading the elements of the alleged unlawful act should be required. That is not the rule. ■ A cause of action for a conspiracy in restraint of trade " 'must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts. [Citations.]' [Citation.] General allegations of agreement have been held sufficient [citation], and the conspiracy averment has even been held unnecessary, providing the unlawful acts or civil wrongs are otherwise sufficiently alleged."

(*Chicago Title Ins. Co.* v. *Great Western Financial Corp., supra,* 69 Cal.2d at p. 316, quoting *Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 64-65 [35 Cal.Rptr. 652]; see also *Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 631 [102 Cal.Rptr. 815, 498 P.2d 1063].)

"[T]he rule established by *Chicago Title* essentially is that a plaintiff cannot merely restate the elements of a Cartwright Act violation. Rather, in order to sufficiently state a cause of action, the plaintiff must allege in its complaint certain facts in addition to the elements of the alleged unlawful act so that the defendant can understand the nature of the alleged wrong and discovery is not merely a blind 'fishing expedition' for some unknown wrongful acts." (*Cellular Plus, Inc.* v. *Superior Court* (1993) 14 Cal.App.4th 1224, 1236 [18 Cal.Rptr.2d 308].) As the court recognized in *Cellular Plus, Inc.,* in the context of a price fixing agreement, "conspirators rarely make such agreements in the open or document their illicit agreements. Rather, it is usually the situation that such agreements are made covertly, thereby making it difficult for a plaintiff to allege the full details of such . . . agreement prior to its ability to engage in the 'rock-turning' allowed by discovery." (*Id.* at p. 1239; see also *Saxer* v. *Philip Morris, Inc.* (1975) 54 Cal.App.3d 7, 27 [126 Cal.Rptr. 327] ["Antitrust schemes generally are conceived in secrecy and live their lives in relative obscurity.")

Fairly read, this complaint alleges a conspiracy to deny title insurance. If such a conspiracy exists, First American necessarily has knowledge of its existence and of all of the facts relevant thereto. The allegation that First American has conspired with Stewart Title and Placer Title to discriminate against properties with a tax sale in the chain of title may be redundant, but again alleges a conspiracy of which First American would have knowledge if the allegation is true. Even if the allegation that First American required a quiet title action in the Constant transaction is viewed as a concession by plaintiffs that First American may ultimately insure the Constant title, however, a conspiracy among First American, Stewart Title, and Placer Title to deny title insurance to tax-defaulted parcels is sufficiently pled.

We next consider whether those allegations, if true, may establish a violation of the Cartwright Act.

C. *The Cartwright Act.*

Section 16720, a part of the Cartwright Act, includes the following among the acts it defines as a prohibited "trust": "[A]cts by two or more persons . . . : [¶] (a) To create or carry out restrictions in trade or commerce." Insurance is "commerce" within the meaning of this section.

(*Speegle* v. *Board of Fire Underwriters, supra,* 29 Cal.2d at pp. 43-44.) ▓▓ While refusing to sell a product to a consumer does not itself violate the Cartwright Act, when that refusal is the result of a combination, agreement, or conspiracy to make that product unavailable in a given market a prohibited restraint of trade may be found. (*Munter* v. *Eastman Kodak Co.* (1915) 28 Cal.App. 660, 667 [153 P. 737].)

As *Munter* v. *Eastman Kodak Co., supra,* 28 Cal.App. at page 667, and section 16720, indicate, however, an agreement among merchants is prohibited by subdivision (a) of section 16720 only if restraint of trade in the commodity is the purpose of the agreement. "A cause of action for restraint of trade under the Cartwright Act or common law principles must allege both a purpose to restrain trade and injury to the business of the plaintiff traceable to actions in furtherance of that purpose. (Bus. & Prof. Code, § 16756; *Speegle* v. *Board of Fire Underwriters,* 29 Cal.2d 34, 41 [172 P.2d 867]; *Willis* v. *Santa Ana etc. Hospital Assn.* [(1962)] 58 Cal.2d 806, 810 [26 Cal.Rptr. 640, 376 P.2d 568].)" (*Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 119 [81 Cal.Rptr. 592, 460 P.2d 464].) Unless another purpose for the defendant's action appears, a court may infer a purpose to act in restraint of trade from allegations describing the effect of the combination. (*Ibid.*) ▓▓ We therefore examine the complaint to determine if it sufficiently alleges that the agreement to deny title insurance to purchasers of property with a tax sale in the chain of title is for the purpose of restraining trade.

Plaintiffs here alleged that title to property conveyed by tax deed has become unmarketable in El Dorado County as a result of the efforts of defendants to convince the public that title insurance is a necessity whenever real property is purchased and the conspiracy among the only three title insurers in the county to refuse to insure title to tax-defaulted property. Plaintiffs have therefore sufficiently pleaded the result of the alleged combination in restraint of trade—title insurance is not sold on tax-defaulted properties and those properties have become unmarketable.

It is true as First American argues, that an insurer may lawfully and individually conclude that the risks inherent in insuring a title to property conveyed by tax deed outweigh the potential benefit and decline to issue title insurance to purchasers of tax-deeded property. "[A]ntitrust laws do not preclude a trader from unilaterally determining the parties with whom it will deal and the terms on which it will transact business." (*G.H.I.I.* v. *MTS, Inc.* (1983) 147 Cal.App.3d 256, 267 [195 Cal.Rptr. 211, 41 A.L.R.4th 653].) Recognition that a single participant in the market might refuse to insure tax deed titles for a legitimate business reason does not demonstrate that there is

"a purpose unrelated to elimination or reduction of competition" (*Jones* v. *H.F. Ahmanson & Co.*, *supra*, 1 Cal.3d at p. 119) for an agreement by a combination of insurers to refuse such policies, however.

We may infer from the allegations of the complaint that an agreement among all title insurers in a county to refuse to issue such policies necessarily assumes that but for such an agreement one or more of the insurers who are parties to the agreement might seek that business. An agreement among all title insurers in a county that none will issue policies on property conveyed by tax deed therefore implies a purpose of ensuring that none will seek what might otherwise become a sufficiently lucrative business opportunity to outweigh the risk.

Other allegations of the complaint also imply a purpose to restrain trade. Plaintiffs allege that First American, Stewart Title, and Placer Title "have engaged in a practice of interfering with land sale contracts by refusing to issue title insurance on parcels purchased by tax sale, in which the title was deemed free and clear by operation of law, one year after the tax sale." Liberally read, an allegation that defendants have a "practice" of interfering in land sale contracts implies a purpose to do so. The allegation that defendants have "manipulated" the market though their representations that title insurance is necessary and then refusing to issue it on tax-deeded parcels also implies a purpose to restrain trade in, and depress the market value of, such property.

What motivation, if such exists, First American and the other insurers might have to render tax deed titles unmarketable or otherwise restrain trade in either title insurance on such properties or on the properties themselves is not an issue at this stage of the proceedings. Here, we consider only whether the complaint sufficiently alleges a combination which has as its purpose the restraint of trade in a commodity.

We conclude that it does.[10]

Amicus curiae Truck Insurance Exchange argues that the court should exercise restraint in construing and applying the UCL to insurance industry

---

[10]Although recovery under the Cartwright Act itself is available only if the plaintiff has suffered damage flowing directly from the prohibited conduct (*Munter* v. *Eastman Kodak Co.*, *supra*, 28 Cal.App. at p. 665; *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 23-24 [144 Cal.Rptr. 664, 6 A.L.R.4th 184]), that is not true under the UCL which permits actions on behalf of the general public seeking injunctive relief. Therefore any violation of the Cartwright Act may form the predicate for a UCL action. Plaintiffs here do allege damage, however.

First American's argument, addressed below, that the complaint fails to state a cause of action on a theory of false and misleading advertising because it does not allege that any purchaser of property relied on its marketing campaign fails for the same reason. This action

practices because of the potentially destabilizing effect of such suits. In support of its argument it notes features of the UCL which permit "pseudo" class actions without the protections available in true class actions, the possibility of duplicative and inequitable nonclass actions, the absence of restrictions on standing to initiate UCL actions, the increased discovery burden on insurers when information about their dealings with others is sought, possible conflicts when the defendant is in a highly regulated industry, and the incentive for frivolous actions in the availability of attorney fees offers. The court is not unmindful of the abuses to which the UCL is subject. (See *Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc.*, *supra*, 17 Cal.4th 553.) Many of those concerns are matters that should be addressed to the Legislature, not the judiciary, however. Other matters, such as application of the UCL to "unfair" practices, and whether actual deception rather than the likelihood of deception should be the standard by which allegedly fraudulent or deceptive conduct is tested under the UCL are not in issue here. We decide here only whether a title insurer's violation of the Cartwright Act in conduct unrelated to rate fixing may be the predicate for a UCL action, and if this complaint states a cause of action under the UCL for violation of the Cartwright Act through a conspiracy to refuse to issue title insurance on property conveyed by tax deed. We decline the invitation to go beyond the issues raised in the petition for review.

As discussed above, this complaint does sufficiently allege a conspiracy to restrain trade. It is not necessary that plaintiffs allege a more specific factual basis for their claim that the defendants agreed among themselves to refuse to write title insurance on tax-defaulted property.

D. *False, Misleading, or Unfair Advertising.*

As noted above, a UCL civil action also may be predicated on "unfair, deceptive, untrue or misleading advertising and any act prohibited by [§§ 17500-17581]." (§ 17200.) Inasmuch as the complaint includes allegations regarding defendants' marketing programs, we next consider whether the complaint sufficiently alleges advertising which falls within these parameters.

Plaintiffs alleged in the first cause of action that defendants "individually and jointly have undertaken marketing programs stressing to consumers the necessity of Title Insurance in a real estate transaction" and "have attempted through advertising and marketing efforts to convince members of the general public that Title Insurance is essential to the protection of a purchaser of real property in the State of California." They also alleged that

is not brought under the statutes prohibiting false advertising (§ 17500 et seq.), but under the UCL. Plaintiffs need only state a violation of that statute or the false advertising statutes.

each defendant had "represented to the public that they would insure any and all real estate which had good title," but conspired to refuse such insurance for land obtained at a tax sale. The second cause of action includes similar allegations and asserts that by this conduct defendants manipulated the real estate market.

There is no allegation that any statement made in the marketing programs regarding the importance of title insurance was false or misleading or was made with the intent to mislead. No violation of section 17530, governing false or misleading statements concerning the extent, location, ownership and title to real estate is stated, therefore. Arguably a violation of section 17500 has been stated, however. That section prohibits advertising property or services with untrue or misleading statements or with the intent not to sell at the advertised price. It prohibits, inter alia, untrue or misleading statements "concerning any circumstance or matter of fact connected with the proposed performance or disposition [of property]." Advertising that title insurance is necessary and will be issued on any property with good title, when in fact it will not be issued on tax-deeded property may be deemed both misleading and false. By failing to exclude tax-deeded property from the representation that title insurance will be issued, such advertising may induce a buyer to enter into a contract for the purchase of land in the anticipation that title insurance will be available. By representing that title insurance will be issued whenever there is "good" title, the advertisement may be deemed false if a tax deed is "good" title.

Defendants do not argue that a tax deed does not convey good title, nor could they and be consistent with the clear legislative intent that a tax deed convey good title. Revenue and Taxation Code section 3711 provides: "Except as against actual fraud, the deed duly acknowledged or proved is conclusive evidence of the regularity of all proceedings from the assessment of the assessor to the execution of the deed, both inclusive." Revenue and Taxation Code section 3712 provides that with the exceptions noted earlier "[t]he deed conveys title to the purchaser free of all encumbrances of any kind existing before the sale . . . ." As the Court of Appeal further explained in *Van Petten, supra,* 38 Cal.App.4th at pages 46-47, again quoting *Craland, supra,* 214 Cal.App.3d at page 1404: " 'The tax deed passes title free of all encumbrances except tax liens or assessments, easements, water rights, . . . recorded restrictions[, and any Internal Revenue Service liens which, pursuant to federal law, are not discharged by the sale]. [Citation.] In the absence of actual fraud, the duly acknowledged or proved tax deed is conclusive evidence of the regularity of the tax sale proceedings. [Citation.] The tax sale furthers the public interest by collecting the taxes owed upon the property, and also returning the property to the tax rolls by placing it into the hands of those who do pay their taxes.' "

The legislative purpose underlying the assurance of Revenue and Taxation Code section 3712 that a tax deed conveys the property free of all preexisting encumbrances is to encourage sale of tax-defaulted property. (*Connors* v. *Jerome* (1948) 83 Cal.App.2d 330, 332 [188 P.2d 770].) This court has described a title a purchaser at a tax sale receives from the state as a *better title* than might otherwise be conveyed. "A property tax operates in rem against the property, and a title granted by a tax deed pursuant to a valid sale of the property for nonpayment of taxes, conveys not merely the title of the person assessed, but a new and complete title under an independent grant from the state. . . . A purchaser at the tax sale may thus receive a better title than that of the person against whom the taxes were assessed, unless he is the defaulting taxpayer or someone acting in his behalf." (*Helvey* v. *Sax* (1951) 38 Cal.2d 21, 24 [237 P.2d 269].)

Nonetheless, the Revenue and Taxation Code provides procedures by which the validity of a tax deed may be determined,[11] thereby acknowledging that a tax deed may be defective. The code also provides limitation periods after which such actions may not be brought or defenses based on a claim of defective title maintained, however. Revenue and Taxation Code section 175 expressly provides that a tax deed to a taxing agency is conclusively presumed valid after one year unless a challenge to the validity of the deed has been commenced.[12] Revenue and Taxation Code section 177 provides a one-year limitation for the commencement of any action to challenge the validity of a deed issued by any taxing agency.[13] (See also Rev. & Tax. Code, §§ 3725, 3726, 3809, and 3810.)

First American argues that the business of a title company does not include researching records of the tax assessment and delinquent tax sale of

[11]See Revenue and Taxation Code sections 3727 (action by purchaser to quiet title against the state), and 3950 (action by purchaser to determine adverse claims to or clouds on title).

[12]Revenue and Taxation Code section 175: "All deeds heretofore and hereafter issued to any taxing agency, including taxing agencies which have their own system for the levying and collection of taxes, by reason of the delinquency of property taxes or assessments levied by any taxing agency or revenue district, shall be conclusively presumed to be valid unless held to be invalid in an appropriate proceeding in a court of competent jurisdiction to determine the validity of the deed commenced within one year after the execution of the deed . . . ."

[13]Revenue and Taxation Code section 177: "(a) A proceeding based on an alleged invalidity or irregularity of any deed heretofore or hereafter issued upon the sale of property by any taxing agency, including taxing agencies which have their own system for the levying and collection of taxes, in the enforcement of delinquent property taxes or assessments, or a proceeding based on an alleged invalidity or irregularity of any proceedings leading up to such deed, can only be commenced within one year after the date of recording of such deed in the county recorder's office . . . .

"(b) A defense based on an alleged invalidity or irregularity of any deed heretofore or hereafter issued upon the sale of property by any taxing agency . . . can only be maintained in a proceeding commenced within one year after the date of recording of such deed in the county recorder's office . . . ."

real property to ensure that statutory procedures have been followed and proper notice given. It speculates that an adversely affected person might nonetheless challenge a tax deed on due process grounds claiming inadequate notice. It is doubtful that a meritorious due process challenge could be made on that basis. Since the state may fix a statute of limitations for the exercise of constitutional rights, it may fix a reasonable limit for claims affecting the right to property. (*Saranac Land & Lumber Co.* v. *Roberts* (1900) 177 U.S. 318 [20 S.Ct. 642, 44 L.Ed. 786]; *Turner* v. *New York* (1897) 168 U.S. 90 [18 S.Ct. 38, 42 L.Ed. 392]; *Elbert, Ltd.* v. *Gross* (1953) 41 Cal.2d 322, 330 [260 P.2d 35]; *Tannhauser* v. *Adama* (1947) 31 Cal.2d 169, 176 [187 P.2d 716, 5 A.L.R.2d 1015]; *Miller & Lux, Inc.* v. *Secara* (1924) 193 Cal. 755, 765 [227 P. 171]; *Davault* v. *Essig* (1947) 80 Cal.App.2d 970, 973 [183 P.2d 39].) As the high court observed in *Saranac Land & Lumber Co.* v. *Roberts*, *supra*, 177 U.S. at page 330 [20 S.Ct. at page 647]: "[A statute of limitations] will bar any right, however high the source from which it may be deduced, provided that a reasonable time is given a party to enforce his right." First American concedes that the Legislature has created a statutory bar to title challenges based on lack of adequate notice after one year,[14] but argues that suits are nonetheless brought. While that possibility may be relevant to a title insurer's concept of "good" title, a consumer's understanding of that term as used in an advertisement for title insurance may differ.

Whether a tax deed conveys "good" title within the meaning of an advertised promise to issue title insurance for any "good" title is a factual question to be addressed by the parties should this matter proceed to trial. For purposes of ruling on a demurrer, we conclude only that, in light of the statute of limitations on challenges to the validity of titles acquired through tax deeds, members of the public might reasonably understand such an advertisement to encompass title acquired at a tax sale. If so, such an advertisement would be misleading if the insurer failed to reveal that a deed traceable to a tax sale was a circumstance excluded from the apparently unequivocal promise to issue a title insurance policy to the purchaser of any property with "good" title.

For the above reasons, the allegations that a representation by a title insurance company that title insurance will be issued on any property with good title, when in fact the insurer will not insure tax deeds, also state a

---

[14]Again, we do not foreclose the possibility that in subsequent proceedings defendant will be able to justify the refusal to issue title insurance as warranted by legitimate business purposes. Since defendant has not supported its concern that Revenue and Taxation Code section 177 does not bar all possible legal challenges to tax deeds on any basis other than lack of notice, we have no occasion here to speculate about the nature of other potential claims or whether there may be exceptions to the one-year limitation of section 177.

cause of action for violation of the UCL. If plaintiffs are able to establish that a tax deed is "good" title within the understanding of a reasonable consumer, the advertisement may be conduct prohibited as unfair competition under the section 17200 definition as "deceptive, untrue or misleading advertising."

### E. *Interference With Contractual Relations.*

 Plaintiffs contend that the allegations of the first cause of action also state a cause of action for interference with existing and prospective contractual relations. Defendant's only rebuttal is that since there was nothing wrong in its refusal to issue the policy of title insurance to Constant, there can be no interference with existing and prospective contractual relations. Wrongfulness independent of the inducement to breach the contract is not an element of the tort of intentional interference with *existing* contractual relations, however.

 "The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587].) The Court of Appeal held that plaintiffs could not state a cause of action for interference with contractual relations because the allegations did not establish that defendants' conduct was wrongful for any reason other than its impact on the contracts for the purchase of tax-defaulted property. This holding fails to properly distinguish the torts of interference with prospective economic advantage and intentional interference with an existing contract.

 Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra*, 11 Cal.4th at p. 392), it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself. (*LiMandri* v. *Judkins, supra*, 52 Cal.App.4th at p. 343.)

As we explained in *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra*, 11 Cal.4th at page 392, it is necessary to distinguish the tort of interference with an existing contract because the exchange of promises which cements an economic relationship as a contract is worthy of protection from a stranger to the contract. Intentionally inducing or causing a breach of an

existing contract is therefore a wrong in and of itself. Because this formal economic relationship does not exist and damages are speculative when remedies are sought for interference in what is only prospective economic advantage, *Della Penna* concluded that some wrongfulness apart from the impact of the defendant's conduct on that prospect should be required. Implicit in the *Della Penna* holding is a conclusion that this additional aspect of wrongfulness is not an element of the tort of intentional interference with an existing contract.

Moreover, the tort of intentional interference with performance of a contract does not require that the actor's primary purpose be disruption of the contract. As explained in comment j to section 766[15] of the Restatement Second of Torts: "The rule stated in this Section is applicable if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition. The rule is broader, however, in its application than to cases in which the defendant has acted with this purpose or desire. It applies also to intentional interference, as that term is defined in § 8A, in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.

"The fact that this interference with the other's contract was not desired and was purely incidental in character is, however, a factor to be considered in determining whether the interference is improper. If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper." (Rest.2d Torts, § 766, com. j at p. 12.)

The complaint here alleged a contract between plaintiff Western Land Bank and Robert Constant. Knowledge of the contract is alleged impliedly in the allegation that defendant First American refused to issue a policy of title insurance unless Constant initiated a quiet title action. Disruption is alleged in the allegation that Constant then failed to complete

---

[15]"One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." (Rest.2d Torts, § 766.)

payment. Damages are alleged in the lost benefits of the transactions and related legal costs. By a conspiracy allegation and similar allegations regarding the tax deeds to the Rahmans and SAR which Placer Title and Stewart Title refused to insure, plaintiffs also satisfy those elements of the cause of action.

Finally, the complaint also alleges that "defendants, and each of them, have deliberately, willfully, and intentionally interfered with the contractual relations of purchasers of land and sellers who are members of the public owning land purchased through a tax sale, including, but not limited to, Plaintiffs herein." Whether plaintiffs can prove that defendant First American intended to interfere with land sale contracts when it denied title insurance, or First American can establish that it had a legitimate business purpose which justified its actions is, again, a matter for trial.

We conclude that the complaint sufficiently alleges a cause of action for intentional interference with existing contractual relations.

F. *Negligence.*

Finally, plaintiffs alleged in their fifth cause of action that defendants "owed a duty to members of the public, including Plaintiffs herein, to issue insurance to any parcel of land, including reporting the legal status of the Title thereof, without discrimination." They also alleged that defendants "had a duty to use known and accepted legal, actuarial, and statutory criteria to determine the legal status of parcels of land to be insured, which they would decline to insure." Allegedly, those duties were breached by defendant's failure to insure any title to land purchased at a tax sale regardless of the merits of the chain of title.

In this court plaintiffs argue that defendants violated a common law duty of nondiscrimination by their concerted refusal to sell title insurance on property which has a tax deed in the chain of title.

We agree with the Court of Appeal that the allegations fail to state a cause of action for negligence.

"The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. (Rest.2d Torts, § 281, subd. (a); 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 732, p. 60.) Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court.

(6 Witkin, *supra*, § 748 at p. 83.)" (*Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835].)

Recognition of a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law. Privity of contract is no longer necessary to recognition of a duty in the business context and public policy may dictate the existence of a duty to third parties. We found that a construction lender had a duty to third party home buyers in *Connor* v. *Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 865 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224], because the lender had control over the quality of construction but failed to prevent major construction defects in the homes whose construction it financed. There we reiterated "[t]he basic tests for determining the existence of such a duty . . . set forth in *Biakanja* v. *Irving* [(1958)] 49 Cal.2d 647, 650 [320 P.2d 16], as follows: 'The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.' " (*Ibid.*)

Applying that test in this case, we decline to recognize a duty to avoid business decisions that may affect the financial interests of third parties, or to use due care in deciding whether to enter into contractual relations with another. Here, defendant had no relationship to the properties plaintiffs sought to sell. It had no control over the sale and no preexisting relationship with the purchasers. The possible impact of unavailability of title insurance on sellers of tax-defaulted property was incidental as is the impact of most business transactions on third parties. It is foreseeable that if title insurance is not readily available the seller may not receive the same price that insurable title would bring. Foreseeability of financial injury to third persons alone is not a basis for imposition of liability for negligent conduct, however. (*Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th at p. 399.) Moreover, unavailability of title insurance is simply one factor in the market price of tax-defaulted property, and the seller may have acquired the property at a reduced price because it was at some time sold at a tax sale. The relationship between the seller's lost profit, if any, and defendant's conduct is tenuous at best. In the specific instances alleged in this complaint, the seller did suffer monetary loss when the sales were not completed because would-be purchasers could not obtain title insurance, but this was a risk that the seller assumed when the property was acquired.

To the extent that state policy seeks to maximize the price paid for property sold for nonpayment of taxes, there may be some "moral blame" in a business practice that results in lower sales prices for such property. Nonetheless, this case is clearly distinguishable from *Connor* v. *Great Western Sav. & Loan Assn.*, *supra*, 69 Cal.2d 850. In *Connor*, the defendant had the knowledge, control, and ability necessary to prevent construction of defective homes. Its negligent failure to monitor the quality of the homes for which it provided construction financing contributed to acquisition of homes with serious construction defects by less knowledgeable third party purchasers.

In *Bily* v. *Arthur Young & Co.*, *supra*, 3 Cal.4th at page 399, we recognized that the client for whom an audit report is prepared has interests that may not be consonant with those of the public and that recognition of a duty to members of the public who might rely on the audit could lead to imposition of liability out of proportion to fault. Here, too, a title insurer acting in what it perceives to be its own business interest in refusing to insure some titles would suffer liability out of proportion to fault if required to consider the business interests of would-be sellers of tax-defaulted property in deciding what insurance to sell. Our observation in *Bily* that the audit report was only one factor in the third party plaintiffs' investment decisions and any negligence in the preparation of the report did not warrant imposition of liability to third parties is equally relevant here. "As a matter of economic and social policy, third parties should be encouraged to rely on their own prudence, diligence, and contracting power, as well as other informational tools. This kind of self-reliance promotes sound investment and credit practices and discourages the careless use of monetary resources." (*Bily* v. *Arthur Young & Co.*, *supra*, 3 Cal.4th at p. 403.)

In the business arena it would be unprecedented to impose a duty on one actor to operate its business in a manner that would ensure the financial success of transactions between third parties. With rare exceptions, a business entity has no duty to prevent financial loss to others with whom it deals directly. A fortiori, it has no greater duty to prevent financial losses to third parties who may be affected by its operations.

While title insurers may not discriminate among purchasers on the basis of the purchasers' race, ethnicity, religion, gender or other personal characteristics (see Civ. Code, § 51), they may opt to limit their potential liability by declining certain risks without violating any statutory or common law obligation. No special relationship existed between plaintiffs and defendants to give rise to a duty to issue a policy of title insurance to a member of the public purchasing tax-defaulted property from plaintiffs, and defendants had

no duty to plaintiffs to ensure that they did not suffer financial losses in their efforts to sell tax-defaulted properties.

Even were there an argument that First American had a duty to conduct its business in a manner that would not cause financial harm to plaintiffs, however, the negligence cause of action fails because negligence is not pleaded. Plaintiffs assert a duty and a breach of the duty, but no negligent act. They allege a business practice of denying title insurance on property conveyed by tax deed, but do not allege that this conduct falls below the standard of care expected of a prudently managed insurance business.

Negligence may be generally pleaded, but there are limits to the generality with which the plaintiff is allowed to state a cause of action. The complaint must indicate the acts or omissions which the plaintiff claims were negligently performed. (*Guilliams* v. *Hollywood Hospital* (1941) 18 Cal.2d 97, 101 [114 P.2d 1]; *Pultz* v. *Holgerson* (1986) 184 Cal.App.3d 1110, 1117 [229 Cal.Rptr. 531].) An allegation that an insurer refuses to issue title insurance on tax-defaulted properties fails to state facts from which an inference of negligence can be drawn.

### III

#### DISPOSITION

The judgment of the Court of Appeal is reversed with directions to remand this matter to the superior court for further proceedings consistent with this opinion.

George, C. J., Mosk, J., Kennard, J., Werdegar, J., and Chin, J., concurred.

**BROWN, J.,** Dissenting.—At oral argument, it became apparent there is no factual basis to support the allegations in the complaint that defendants "conspired" to refuse title insurance to plaintiffs' tax-defaulted property. Counsel conceded plaintiffs presently have no evidence of an agreement. Establishing an "unlawful" agreement under the Cartwright Act is the heart of plaintiffs' case, the central predicate on which their derivative claim under the unfair competition law (Bus. & Prof. Code, § 17200 et seq. (UCL)) rests. (Maj. opn., *ante*, at pp. 49-50.) Without a factual basis, it collapses. The majority's decision to reverse the judgment of dismissal thus turns on a technical rule of pleading—that a demurrer admits all facts properly pleaded in a complaint—combined with official indulgence of plaintiffs' desire to conduct a fishing expedition. I would put this sham lawsuit out of its misery. Because the allegations of the complaint are hopelessly clouded by counsel's

concession at oral argument, I would dismiss the petition for review in this case as improvidently granted.

Even without plaintiffs' concession, I would still find the complaint insufficient to state a claim under the UCL and for interference with contract. The trial court sustained defendants' demurrer without leave to amend. The Court of Appeal affirmed that judgment. The reason is intuitively obvious: "Nothing from nothing leaves nothing."[1] A lawsuit is a means of redressing a cognizable injury. Relying on recommendations of an advisory organization of title insurers, and their own evaluations of the risks presented by tax deeds, defendants do not underwrite tax titles. The organization's advice is exempt from the antitrust provisions of the Cartwright Act (see Ins. Code, § 12414.29), and no law requires title companies to insure unreasonable risks against their business judgment. Despite this straightforward logic, the majority holds that a gossamer skein of suppositions—that defendants "conspired," that a "conspiracy" is "unlawful," that anything "unlawful" will support a UCL suit—is enough to permit this litigation to continue.

The Court of Appeal's result was the right one; this case should not survive a demurrer. Orderly legal development is not advanced by placing this court's imprimatur on yet another unfair competition claim of dubious pedigree.

### "Buying Lawsuits" and Curative Statutes

Tax titles, long regarded as "buying a lawsuit," have historically been uninsurable and practically unmarketable. (2 Bowman, Ogden's Revised Cal. Real Property Law (1975) § 21.26, p. 1098 (Ogden's).) In 1938, in common with other states emerging from the Great Depression, the Legislature strengthened tax titles by enacting limitations statutes requiring attacks based on "irregularit[ies] of the tax collector's deed" to be brought within one year. (Rev. & Tax. Code, §§ 3725, 3726.) Intended to armor tax titles against defeasance in a period of wholesale tax delinquencies and general economic insecurity, these measures were good for the counties because they enhanced marketability. Without them, local governments might face a glut of tax-defaulted property and falling revenues. (Ogden's, *supra*, § 21.26, at p. 1098 ["in 1937, in Los Angeles County, over 100,000 parcels" removed from the tax rolls]; see also *Craland, Inc. v. State of California* (1989) 214 Cal.App.3d 1400, 1404 [263 Cal.Rptr. 255] ["The tax sale furthers the public interest by collecting taxes owed . . . and also returning the property to the tax rolls . . . ."].)

---

[1] From the tune, *Nothing From Nothing,* by Billy Preston.

Despite plaintiffs' claim to the contrary, shortened limitations statutes do not mean tax titles are risk free. (*Van Petten* v. *County of San Diego* (1995) 38 Cal.App.4th 43, 50 [44 Cal.Rptr.2d 816] ["a purchaser of property at a tax sale takes the risk of any defect"].) Plaintiffs overlook that property owners involuntarily "sold out" by tax foreclosures are an inherently sympathetic lot, just as those who buy tax titles are speculators profiting off the misfortune of others. (See, e.g., Note, *The Current Status of Tax Titles: Remedial Legislation v. Due Process* (1948) 62 Harv. L.Rev. 93, 100, fn. 40 ["[T]ax lien purchasers are traditionally speculators who do not enlist the sympathy of the court."].) Forced to choose, courts may look with a jaundiced eye on such a newly minted title, especially given the often gross disparity between land value and tax redemption price. (See *id.* at p. 100 ["[T]he notorious insecurity of tax titles keeps the purchase price at the level of the statutory minimum—taxes, interest, penalties, and costs of the sale."].)

This minefield of contingencies would naturally weigh against the actuarial calculations of any rational insurer, the "curative" provisions of Revenue and Taxation Code sections 3725 and 3726 notwithstanding. It is not surprising, then, that the Legislature has not *required* title companies to insure tax titles. Yet it is just that extraordinary proposition plaintiffs assert is the law. The majority does not endorse plaintiffs explicitly, it does so impliedly by holding they may seek to prove summary allegations that defendants "conspired" to refuse them title insurance. (See maj. opn., *ante*, at pp. 49-50.) Such allegations are easy to plead. Holding these legally sufficient to survive a demurrer ensures costly, extended litigation and furnishes leverage for settlement, especially where a conclusory "conspiracy" is the *only* predicate for a UCL claim. Unlike the majority, I would require more.

## JUDICIAL ABSTENTION, THE UCL AND PRIMARY JURISDICTION

It is a truism that UCL litigation over industry-wide economic practices hampers rather than advances effective regulation. Several recent private UCL suits seeking to short-circuit complex regulatory schemes have been dismissed on that common ground. As one Court of Appeal wrote in dismissing a suit seeking "court-created regulation of [insurance] brokers" (*Crusader Ins. Co.* v. *Scottsdale Ins. Co.* (1997) 54 Cal.App.4th 121, 138 [62 Cal.Rptr.2d 620]), "[i]nstitutional systems are . . . in place to deal with [the issue]. There is no need or justification for the courts to interfere . . . ." (*Ibid.*) *Wolfe* v. *State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554 [53 Cal.Rptr.2d 878] is on all fours. Plaintiff sought a judgment that a refusal to include earthquake damage in homeowners insurance policies

violated the UCL; the Court of Appeal dismissed: "Assuming . . . [plaintiff] can state a cause of action . . . that by itself does not permit unwarranted judicial intervention in an area of complex economic policy." (*Id.* at pp. 564-565, fn. omitted; see also *Samura* v. *Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1301-1302 [22 Cal.Rptr.2d 20] [UCL suit challenging health policy reimbursement provision; "courts cannot assume general regulatory powers over health maintenance organizations through [the UCL]"]; *California Grocers Assn.* v. *Bank of America* (1994) 22 Cal.App.4th 205, 218 [27 Cal.Rptr.2d 396] [UCL challenge to bank assessments on "NSF" checks; "[j]udicial review of one service fee charged by one bank is an entirely inappropriate method of overseeing bank service fees"].)

Because these cases implicated complex regulatory issues, their resolution in a private UCL suit was "inappropriate." Either the Legislature had imposed its own regulatory solution, or UCL litigation was the wrong medium. And because regulatory proceedings were more appropriate, these courts abstained, refusing to exercise jurisdiction under the UCL. The reasoning of these cases applies here, where plaintiffs, by leveraging the UCL, want to require the Superior Court of El Dorado County to assume the regulatory jurisdiction of the Department of Insurance. That the insurance industry is highly regulated suggests a related doctrine may apply—"primary jurisdiction." We invoked that doctrine in *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377 [6 Cal.Rptr.2d 487, 826 P.2d 730] (*Farmers*), a case presenting the same mix of economic, policy and regulatory issues. The Attorney General sued to require auto insurers to offer the "Good Driver Discount" adopted as part of Proposition 103 (Ins. Code, §§ 1861.02, 1861.05; enacted by the voters in Nov. 1988). Relying on provisions of the Insurance Code, we concluded that "considerations of judicial economy, and concerns for uniformity in application of the complex insurance regulations," supported initial resort to the Insurance Commissioner. (*Farmers, supra,* 2 Cal.4th at p. 396.)

It is not simply that a single superior court judge hearing a single UCL case is a poor choice to resolve a myriad of complicated fact and policy issues tied to the economics, risks, cost and availability of title insurance. It is that given the scope of its administrative authority and depth of regulatory experience, the Department of Insurance is likely to prove better at the job. In this case, the practical meaning of primary jurisdiction is the virtual plenary jurisdiction of the department over insurance and insurers and their business practices. It can employ resources to develop an accurate picture of the economics of title insurance, its costs, availability, and industry practices; it can determine the forces behind plaintiffs' complaint; if warranted, it can prescribe an industry-wide remedy. It was to support the use of broad

administrative powers in highly regulated businesses that primary jurisdiction was invented. Just as we took advantage of the commissioner's resources in *Farmers, supra,* 2 Cal.4th 377, we ought to do so here. Whether proceedings before the department increase the availability of title insurance for tax deeds is not the point. Primary jurisdiction does not oust the courts; it enables them to bring the investigative and policy resources of experts to bear on complex regulatory issues.

## INTERFERENCE WITH CONTRACT

In *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376 [45 Cal.Rptr.2d 436, 902 P.2d 740] (*Della Penna*), we held that unqualified claims of interference with economic "expectations" were at odds with fundamental notions of commercial competition. Unless checked, they threatened perverse results, rewarding the inefficient and penalizing the competitive. (*Id.* at p. 384.) Such suits could not be maintained, we ruled, unless plaintiff proved conduct "wrongful by some legal measure *other* than . . . interference itself." (*Id.* at p. 393, italics added.) Proof of an *independent* wrong was required. (*Ibid.*) The majority would distinguish the claim in *Della Penna* from plaintiffs' allegations of *contractual* interference. But that distinction is not significant here. The allegation of tortious interference with contract is not that defendants *induced* others to breach contracts with plaintiffs. It is the claim they interfered with the *performance* of those contracts, not by directly and purposefully hindering performance, but as an indirect effect of the evenhanded, industry-wide, recommended practice of not insuring the abnormal risks tax titles present.

Such contract claims, like economic expectations claims, also require more than a bald allegation of "interference," especially when they allege no more than the pursuit of legitimate commercial interests. That additional requirement is the same "interference *plus*" independently improper conduct we imposed in *Della Penna, supra,* 11 Cal.4th 376. According to section 766 of the Restatement Second of Torts, "One who intentionally and *improperly* interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform . . . is subject to· liability . . . ." (*Id.* at p. 7, italics added.) That is the majority rule. It means what it says: "The keystone of the statement is the adverb 'improperly' . . . ." (*Guard-Life Corp.* v. *S. Parker Hardware Mfg.* (1980) 50 N.Y.2d 183 [428 N.Y.S.2d 628, 406 N.E.2d 445, 448].) To state an interference with contract claim, plaintiffs must prove more than a breach; they must prove a breach caused by *wrongful or improper* conduct. (See, e.g., *Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co.* (1978) 283 Or. 201 [582 P.2d 1365, 1372] [acts by insurer "wholly consistent with [its] pursuit

of its own business purposes" did not support inference of "improper purpose to injure [plaintiff]"]; *Wagenseller* v. *Scottsdale Memorial Hosp.* (1985) 147 Ariz. 370 [710 P.2d 1025, 1043] ["We find nothing inherently wrongful in 'interference' itself. . . . [L]iability must be based on more than . . . interference alone."]; *Alvord and Swift* v. *Stewart M. Muller Const. Co.* (1978) 46 N.Y.2d 276 [413 N.Y.S.2d 309, 310, 385 N.E.2d 1238, 1239] [interference with performance not actionable where "incidental to another legitimate business purpose"].)

We said as much in *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118 [270 Cal.Rptr. 1, 791 P.2d 587]. Dismissing a contract interference claim on the ground that defendant had done no more than counsel a client to seek a judicial determination whether it could terminate a contract, we called plaintiff's suit "to make it a tort to induce potentially meritorious litigation," "repugnant" to the philosophy of unhindered access to the courts. (*Id.* at p. 1137.) Because access to the courts was not wrongful or improper, it was not tortious. Despite the majority's assertion that "[w]rongfulness independent of the inducement to breach . . . is not an element of the tort of intentional interference" with contract (maj. opn., *ante*, at p. 55), the law is to the contrary. A refusal to insure tax titles founded on economically rational, commercially prudent considerations is neither wrongful nor improper. And it is not a tort.

I dissent.

On September 23, 1998, the opinion was modified to read as printed above.