# IN THE SUPREME COURT OF CALIFORNIA

MANNY VILLANUEVA et al.,
Plaintiffs and Appellants,

v.

FIDELITY NATIONAL TITLE COMPANY,
Defendant and Appellant.

S252035

Sixth Appellate District
H041870 and H042504

Santa Clara County Superior Court
1-10-CV173356

March 18, 2021

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Groban, and Jenkins concurred.

VILLANUEVA v. FIDELITY NATIONAL TITLE COMPANY

S252035


Opinion of the Court by Kruger, J.


The Insurance Code requires title insurers and title companies to file most rates with the Insurance Commissioner before charging those rates to consumers. (Ins. Code, §§ 12401.1, 12401.7, 12414.27.) The issue in this case is whether, if a title insurer charges rates without filing them, a consumer can challenge the charges as unlawful in court. The insurer in this case argues the answer is no for two reasons. First, it asserts entitlement to immunity under a provision barring suits under noninsurance laws for any "act done, action taken, or agreement made pursuant to the authority conferred" by the rate-filing statutes. (*Id.*, § 12414.26.) Second, it argues that under other provisions of the Insurance Code, unfiled-rate claims are committed to the exclusive jurisdiction of the Insurance Commissioner.

We reject both arguments. The statutory immunity for "act[s] done . . . pursuant to the authority conferred" (Ins. Code, § 12414.26) by the rate-filing statutes does not shield title insurers from suit for charging unauthorized rates, and the Insurance Commissioner does not have exclusive jurisdiction over such claims. We reverse the judgment of the Court of Appeal, which reached the opposite conclusion on both questions, and remand for further proceedings.

## I.

When plaintiff Manny Villanueva (Villanueva) and his wife Sonia refinanced the mortgage on their home, defendant Fidelity National Title Company (Fidelity) handled the escrow and Fidelity National Title Insurance Company supplied title insurance. For its services, Fidelity charged the Villanuevas an escrow fee, overnight delivery fee, courier fee, and draw deed fee (i.e., a fee for preparing a new deed).

Villanueva later sued Fidelity, asserting that the delivery, courier, and draw deed fees added to the Villanuevas' escrow statement were illegal because they had never been filed with the Insurance Commissioner (Commissioner). (See Ins. Code, §§ 12401.7 ["No title insurer . . . shall use any rate in the business of title insurance . . . prior to the filing" and public display of the rate], 12414.27.) The original complaint alleged a range of common law claims and a statutory claim under the unfair competition law. (Bus. & Prof. Code, § 17200 et seq. (UCL).)[1] Subsequent motions eliminated the common law claims, leaving only the UCL claim. Villanueva sought to certify a class of similarly situated consumers, and the court granted the motion.

Following a bench trial, the court determined that Fidelity was required to file its rates with the Commissioner, that document delivery was a service for which a rate filing was

---

[1] "The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.' [Citation.] Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' " (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320.)

required, and that Fidelity had not filed its delivery service rate. The court further determined that, for the first two years of the class period, Fidelity had no rate on file for drawing deeds or document preparation, and thus during that period, the fee for drawing up a deed was also illegal.

The trial court rejected Fidelity's argument that it should be held immune from Villanueva's suit under Insurance Code section 12414.26 (section 12414.26). The court reasoned that the section insulates from suit only those actions that are authorized by relevant provisions of the Insurance Code. Because those provisions do not authorize charging unfiled rates, section 12414.26 immunity did not apply.

Based on its findings, the trial court granted the class injunctive relief. But it denied restitution on the ground that the rates charged were disclosed to and approved by Villanueva and other class members, who received the benefit of their bargain, the services for which they paid.[2]

Both sides appealed. The Court of Appeal reversed in part and ordered the trial court to enter judgment dismissing the suit. (*Villanueva v. Fidelity National Title Co.* (2018) 26 Cal.App.5th 1092, 1136.) It concluded the class claims were barred for two independent reasons. First, reversing the trial court, the Court of Appeal held that Fidelity was in fact immune from Villanueva's suit under section 12414.26. Invoking language from *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26 (*Quelimane*), the Court of Appeal reasoned that immunity under the statute extends to all " 'ratemaking-

---

[2] The trial court's ruling denying restitution is not before us, and we express no views concerning its correctness.

related activities,' " a category that includes the charging of unfiled rates. (*Villanueva*, at p. 1124, quoting *Quelimane*, at p. 46.) Second, the court held that the statutory scheme affords consumers charged unfiled rates only one avenue of redress: an administrative complaint submitted to the Commissioner pursuant to article 6.7 (Ins. Code, §§ 12414.13–12414.19) of the title insurance chapter. The Court of Appeal concluded the trial court therefore lacked jurisdiction to consider the merits of Villanueva's suit. (*Villanueva*, at pp. 1126–1128.)

We granted review to consider both components of the Court of Appeal's ruling.

## II.

Title insurance "is a customary incident of practically every California real estate transaction," including a sale or refinancing. (*Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 314; see 3 Miller & Starr, Cal. Real Estate (4th ed. 2020) § 7:1, pp. 7-13 to 7-14.) Title insurers insure "the record title of real property for persons with some interest in the estate, including owners, occupiers, and lenders." (*FTC v. Ticor Title Ins. Co.* (1992) 504 U.S. 621, 625.) A title insurance policy is not a guarantee as to the state of the property's title. (*Quelimane*, *supra*, 19 Cal.4th at p. 41; *Siegel v. Fidelity Nat. Title Ins. Co.* (1996) 46 Cal.App.4th 1181, 1191.) It instead offers indemnification to the insured against many losses arising from title defects not disclosed in the title policy or report, as well as errors by the entity performing the title search. (Ins. Code, §§ 104, 12340.1, 12340.2; see *Ticor Title*, at pp. 625–626.)

Title insurance differs in some respects from other forms of insurance. While most other forms of insurance provide

protection against future loss, title insurance instead relates to the past; it protects against undisclosed encumbrances and defects in title that exist at the time the policy is issued. (*Quelimane*, *supra*, 19 Cal.4th at p. 41; *King v. Stanley* (1948) 32 Cal.2d 584, 590.) Thus, rather than requiring periodic, ongoing premiums to obtain continuing future coverage, title insurance requires a one-time payment (*Wolschlager v. Fidelity National Title Ins. Co.* (2003) 111 Cal.App.4th 784, 789) compensating for the risk assumed and the services rendered in connection with researching and preparing the policy (see Ins. Code, § 12340.7). Notwithstanding these differences, title insurance and title insurance rates are subject to regulation by the Insurance Commissioner, just like more classical forms of insurance and insurance premiums. (See Ins. Code, §§ 12340–12418.4.)

The work involved in supplying a title insurance policy is often divided between the title insurer and other entities. Fidelity is what is known as an "underwritten title company," meaning a company that conducts the title search and prepares a preliminary title report and may also collect fees and issue the policy on behalf of the title insurer. (See Ins. Code, §§ 12340.4, 12340.5; *Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 720.) For the regulatory purposes at issue here, title insurers and underwritten title companies are treated alike. (See, e.g., Ins. Code, §§ 12401.1, 12401.2, 12401.7, 12401.71.) For convenience, therefore, we will refer to both as simply "title insurers."

The Insurance Code requires all title insurers to file a schedule of their rates with the Commissioner. (Ins. Code, § 12401.1.) The filing requirement extends to any rate imposed as part of "the business of title insurance" (*id.*, § 12401.7), which

includes "any service in conjunction with the issuance . . . of a title policy including but not limited to the handling of any escrow, settlement or closing in connection therewith" (*id.*, § 12340.3, subd. (c)).[3] Once rates are filed, regulated entities are required to wait 30 days before using them. (Ins. Code, §§ 12401.1, 12401.7.) This regulatory approach — commonly known as "file and use" — allows entities to implement their filed rates without the need for formal prior approval. (See *McCray v. Fidelity Nat. Title Ins. Co.* (D.Del. 2009) 636 F.Supp.2d 322, 325 [in a " 'file and use' state . . . the insurers file their rates with the [Department of Insurance] and begin to charge them after the effective date stated in their filings, unless the Commissioner disapproves the rates"]; Quiner, *Title Insurance and the Title Insurance Industry* (1973) 22 Drake L.Rev. 711, 724.)

The Legislature first established this system of title insurance rate regulation in 1973. Although voters would later require the Commissioner to affirmatively approve most other insurance rates before they could take effect (Prop. 103, as approved by voters, Gen. Elec. (Nov. 8, 1988); see *Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1259), they expressly exempted title insurance from this prior-approval approach (Ins. Code, §§ 1851, subd. (d), 1861.13). The system in place today is thus the same file-and-use system the Legislature originally chose in 1973.

The issue in this case concerns the remedies available to a consumer when a title insurer uses rates that it has not filed. Fidelity argues, and the Court of Appeal agreed, that the

---

[3] There is an exception for "miscellaneous charges." (Ins. Code, § 12340.7.) This exception is not at issue here.

relevant statutory provisions leave no room for a consumer to sue based on unfiled-rate charges — both because section 12414.26 immunizes their ratemaking from civil suit under noninsurance laws and because administrative complaints to the Commissioner constitute the exclusive avenue for consumer relief.  We consider each argument in turn.

## III.

## A.

To determine the scope of the immunity afforded by section 12414.26, we begin, as always, with the text, which affords the best guide to the Legislature's intent.  (See, e.g., *McLean v. State of California* (2016) 1 Cal.5th 615, 622; *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 844.)  The statute provides in full:  "No act done, action taken, or agreement made pursuant to the authority conferred by Article 5.5 (commencing with Section 12401) or Article 5.7 (commencing with Section 12402) of this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this state heretofore or hereafter enacted which does not specifically refer to insurance."  (§ 12414.26.)  Villanueva argues that this provision extends immunity only to conduct authorized by the relevant articles and that the unfiled rates challenged here are not authorized.  Fidelity counters that the conduct here is authorized by the referenced articles.  But it also contends that the provision in any event extends immunity beyond conduct *authorized* by the relevant articles to conduct *regulated* by the relevant articles.

To evaluate Fidelity's argument that Villanueva's suit targets conduct authorized by articles 5.5 and 5.7, we begin by examining what it is, precisely, that these articles authorize.

Article 5.5 (Ins. Code, §§ 12401–12401.10) is the article directly relevant here. It governs title insurance rate filing and regulation. Among other things, article 5.5 requires title insurers to "establish basic classifications of coverages and services" as a basis for their rates (Ins. Code, § 12401.2; see *id.*, § 12401.3, subd. (d)) and to then file those rates with the Commissioner (*id.*, § 12401.1). The article forbids rates that are excessive, inadequate, or discriminatory. (*Id.*, § 12401.3, subd. (a).) It generally prohibits title insurers from charging unfiled rates or rates before their effective date, 30 days after filing. (*Id.*, §§ 12401.1, 12401.7; see *id.*, §§ 12401.71, 12401.8 [specifying exceptions].) In addition, article 5.5 permits insurers to consult with each other and with industry organizations and share information and loss experience data (*id.*, § 12401.4), data that is central to the insurers' ability to set rates (see *State Comp. Ins. Fund v. Superior Court* (2001) 24 Cal.4th 930, 939 (*State Fund*) [" 'As a practical matter the business of insurance cannot be conducted and maintained upon a sound basis unless insurance carriers discuss and pool their experience for rate making purposes,' " quoting Joint Interim Legis. Com., Rep. on Ins. Reg., 1 Sen. J. Appen. (1947 Reg. Sess.) p. 5]). Finally, the article permits entities under the same management to act in concert. (Ins. Code, § 12401.6.)

Article 5.7 (Ins. Code, §§ 12402–12402.2) regulates insurance advisory organizations, a term defined to include entities that "collect[] and furnish[] to [their] members or insurance supervisory officials loss and expense statistics or other statistical information and data relating to the business of title insurance." (*Id.*, § 12340.8.) Through such organizations, insurers may obtain a much deeper pool of loss experience data than they would otherwise have at their disposal.

Fidelity argues that because article 5.5 regulates rates for the business of title insurance, the act of charging rates — including unfiled rates — is an act "done . . . pursuant to the authority conferred by Article 5.5." (§ 12414.26.) But article 5.5 is more narrowly drawn. It contemplates that title insurers may: (1) charge a filed rate after its effective date (Ins. Code, §§ 12401.1, 12401.7); (2) charge a filed rate before its effective date if the new rate results in a rate reduction (*id.*, § 12401.71, subd. (a)); and (3) for unusual risks or services, impose surcharges in excess of those set forth in the rate filing, provided the surcharges are reasonable and approved in writing in advance (*id.*, § 12401.8). Setting aside "miscellaneous charges" (*id.*, § 12340.7), the imposition of any charge that does not fit within these categories would not be authorized by article 5.5. The rates charged here, which were never filed with the Commissioner, do not fall into any of these categories. Far from being authorized, they are expressly prohibited. (See Ins. Code, §§ 12401.1, 12401.7, 12414.27.)

Fidelity's alternative contention — that immunity extends not just to conduct authorized by article 5.5 but also to any matter regulated by the article — is plainly contradicted by the language of the statute. Section 12414.26 extends immunity only to acts done, actions taken, or agreements made "*pursuant to the authority* conferred by Article 5.5 . . . or Article 5.7." (Italics added.) If the Legislature had wished to adopt Fidelity's desired approach, it could have simply written, "No *matter regulated under* Article 5.5 or Article 5.7" shall be a basis for suit under a law not specifically referencing insurance. The Legislature instead chose to include language explicitly limiting immunity to acts authorized by, rather than merely regulated under, the relevant articles, and we must give effect to that

choice. (E.g., *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038 [when possible, "courts should give meaning to every word of a statute"].)[4]

Prior cases reinforce our understanding of section 12414.26 immunity. Section 12414.26 is not the only provision of its kind; it is one of four nearly identical immunity provisions scattered through the Insurance Code that supplement limited state regulation with partial immunity for specific categories of insurance. (See Ins. Code, §§ 795.7, 1860.1, 11758, 12414.26.) These statutes address the same class of subjects and share a common purpose, and so their parallel language should be construed in like fashion. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1161; accord, e.g., *People v. Tran* (2015) 61 Cal.4th 1160, 1167–1168.) Those courts that have addressed the issue have consistently understood the language of these provisions to immunize acts affirmatively authorized by the relevant provisions of the Insurance Code, as opposed to acts that are merely regulated under those provisions.

In *State Fund*, *supra*, 24 Cal.4th 930, for example, we emphasized that by the express terms of Insurance Code section 11758, immunity extends only to acts taken and agreements made " '*pursuant to the authority* conferred by this article' " (*State Fund*, at p. 936, quoting Ins. Code, § 11758, italics added by *State Fund*), not to any act taken or agreement made

---

[4] Limiting the immunity conveyed by section 12414.26 to the scope expressly granted by its terms also conforms to the "general rule of statutory construction . . . that a legislative grant of privilege or immunity is strictly construed against the grantee." (*Katsaris v. Cook* (1986) 180 Cal.App.3d 256, 265, citing 3 Sutherland, Statutory Construction (4th ed. 1974) § 63.02, p. 81.)

" 'pursuant to this article' " (*State Fund*, at p. 936). We identified what the relevant article authorized — namely, specific forms of cooperation between insurers — and concluded that immunity applied only if the challenged wrongdoing, the miscalculation and misreporting of loss information, was "related to such authorized cooperation." (*Ibid.*) Because the alleged wrongdoing was not related to any such authorized cooperation, the insurer was not entitled to immunity.[5]

To similar effect is *Fogel v. Farmers Group, Inc.* (2008) 160 Cal.App.4th 1403, in which insurance exchanges sought immunity under a different parallel statute, Insurance Code section 1860.1 (section 1860.1), for their collection of certain fees. Pointing to the plain statutory text, the Court of Appeal explained that the collection of fees would be immune from suit only if it was "an act done or action taken under the authority conferred by" the relevant chapter. (*Fogel*, at p. 1416.) Because the defendants could "not identify any specific provision [of the chapter] that authorize[d] them to collect" the fees, no immunity applied. (*Ibid.*; see *id.* at pp. 1416–1417; accord, *MacKay v. Superior Court* (2010) 188 Cal.App.4th 1427, 1443 [§ 1860.1 "does not exempt all acts done 'pursuant to' the chapter — which is to say, all ratemaking acts — but instead exempts acts done

---

[5]     Fidelity tries to distinguish *State Fund* on the ground that the article prescribing the scope of immunity for Insurance Code section 11758 differs from the underlying articles determining the scope of immunity under section 12414.26. While that may be, the relevance of *State Fund* does not depend on any substantive similarity in what it is those underlying articles authorize, but rather on the point that each statute extends immunity only to what is authorized — whatever that may be — and not to acts that are related to, but unauthorized by, the underlying article.

'pursuant to the authority conferred by this chapter' "]; *MacKay*, at p. 1449 [immunity "does not extend to insurer conduct *not* taken pursuant to that authority"].)

Much as in these prior cases, we see nothing in the plain language of section 12414.26 that supports Fidelity's expansive view of its immunity from suit. The provision confers immunity for acts, actions, or agreements authorized by articles 5.5 and 5.7. This statutory immunity does not extend to the charging of unfiled rates because those articles confer no such authority; on the contrary, the referenced articles expressly prohibit the charging of unfiled rates.

We consider the text clear on this point. But to the extent any uncertainty remains, we may also look to the provision's history. (See, e.g., *In re Marriage of Davis* (2015) 61 Cal.4th 846, 853–862; *ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1258–1262.) That history reinforces the conclusion that section 12414.26 was not designed to immunize title insurers for any and all activities related to rate-setting — including, as Fidelity would have it, charging unfiled rates.

Section 12414.26 and the related immunity provisions (see Ins. Code, §§ 795.7, 1860.1, 11758) were a byproduct of legal changes in the regime governing the application of antitrust law to the insurance field. To understand these provisions in historical context thus requires a brief excursion into the development of that body of law.

In its infancy, antitrust law was generally assumed not to apply to the insurance industry. In 1869, the United States Supreme Court had held that insurance contracts were neither interstate nor commercial transactions for purposes of the

federal commerce clause. (*Paul v. Virginia* (1869) 75 U.S. 168, 182–185.) Though *Paul* did not expressly address the question, the implications for federal insurance regulation seemed clear: If an insurance contract was not interstate commerce, then insurers could not be subject to federal regulation under the commerce clause. Thus, when Congress later invoked its commerce clause power to enact the Sherman Antitrust Act of 1890 and other antitrust legislation, the insurance industry generally proceeded on the assumption that the industry lay beyond the reach of the laws' restrictions. (Carlson, *The Insurance Exemption from the Antitrust Laws* (1979) 57 Tex. L.Rev. 1127, 1130.) The same assumption applied to this state's antitrust laws, which similarly trained their sights on combinations operating to restrain "commerce." (Stats. 1907, ch. 530, § 1, p. 984; see *Speegle v. Board of Fire Underwriters* (1946) 29 Cal.2d 34, 43 (*Speegle*).) This assumption led insurers to engage in the common industry practice of sharing claims history information to assist in setting premiums, free from worries about potential liability for engaging in concerted action. (Cf. *Group Life & Health Ins. Co. v. Royal Drug Co.* (1979) 440 U.S. 205, 221 [noting "the widespread view that it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation"]; *Speegle*, at p. 45; State Deputy Ins. Comr. J. R. Maloney, letter to Governor Earl Warren re Sen. Bill No. 1572 (1947 Reg. Sess.) June 10, 1947, p. 1.)

The assumption was proved false in 1944, however, when the United States Supreme Court decided *U.S. v. Underwriters Assn.* (1944) 322 U.S. 533. In that case, the court revisited and overruled *Paul*, concluding that insurance qualified as interstate commerce after all and that nothing in the Sherman

Act exempted insurers from its reach.  (*Underwriters Assn.*, at pp. 553, 560–561.)  This court shortly followed suit, concluding that state antitrust law likewise contained no exemption for insurers and so they could be found liable under the state's principal antitrust law, the Cartwright Act.  (*Speegle, supra*, 29 Cal.2d at pp. 43–46; see Bus. & Prof. Code, §§ 16700–16758.)

These developments significantly altered the insurance landscape.  Newly faced with significant antitrust exposure, insurers quickly sought both federal and state legislative relief.  Their efforts were successful.  In 1945, Congress enacted the McCarran-Ferguson Act, which provided that states would continue to play the primary role in regulating the insurance industry.  (15 U.S.C. §§ 1011–1015; see *Group Life & Health Ins. Co. v. Royal Drug Co., supra*, 440 U.S. at pp. 217–220.)  The federal statute further declared a temporary moratorium on applying federal antitrust law to the insurance industry (15 U.S.C. § 1013), with application of federal law to resume only to the extent the insurance industry was not regulated in a given state by the end of the moratorium period (*id.*, § 1012(b).)  In response, the California Legislature passed the McBride-Grunsky Insurance Regulatory Act of 1947.  (Stats. 1947, ch. 805, pp. 1896–1908 (McBride-Grunsky Act); *State Fund, supra*, 24 Cal.4th at p. 938.)  By supplying rudimentary regulation of certain lines of insurance, the McBride-Grunsky Act ensured that insurers would remain exempt from federal antitrust regulation.  (See *State Fund*, at p. 939; *Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 980; State Deputy Ins.

Comr. J. R. Maloney, letter to Governor Earl Warren re Sen. Bill No. 1572, *supra*, June 10, 1947, pp. 1–2.)[6]

The immunity language now found in section 12414.26 traces its origins to this early legislative effort at state insurance regulation. One of the stated purposes of the McBride-Grunsky Act was to authorize and define the permissible extent of "cooperation between insurers in rate making and other related matters." (Ins. Code, former § 1850, added by Stats. 1947, ch. 805, § 1, p. 1896 and repealed by Prop. 103, § 7, as approved by voters, Gen. Elec. (Nov. 8, 1988).) Former section 1853, for example, permitted insurers to share information and act in concert when setting rates, while former section 1853.6 largely prohibited agreements to adhere to the same rates. (Ins. Code, former § 1853, added by Stats. 1947, ch. 805, § 1, p. 1898 and repealed by Prop. 103, § 7, as approved by voters, Gen. Elec. (Nov. 8, 1988); Ins. Code, former § 1853.6, added by Stats. 1947, ch. 805, § 1, p. 1899 and repealed by Prop. 103, § 7, as approved by voters, Gen. Elec. (Nov. 8, 1988).) In tandem with these

---

[6] The McBride-Grunsky Act was designed only to "enact[] the minimal regulation required to exempt California insurance from federal antitrust law." (*King v. Meese* (1987) 43 Cal.3d 1217, 1240 (conc. opn. of Broussard, J.).) The law made California "a so-called 'open rate' state," with rates "set by insurers without prior or subsequent approval by the . . . Commissioner." (*Id.* at p. 1221 (maj. opn).) Indeed, the act prohibited the Commissioner from fixing rates, relying instead on the open market to dictate rates. (See Ins. Code, former § 1850, added by Stats. 1947, ch. 805, § 1, p. 1896 and repealed by Prop. 103, § 7, as approved by voters, Gen. Elec. (Nov. 8, 1988); *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 287, fn. 15, 300.) Under this regime, " 'California ha[d] less regulation of insurance than any other state . . . .' " (*Garamendi*, at p. 240.)

provisions, the Legislature conferred immunity on insurers who engaged in such authorized activities. Section 1860.1 provides: "No act done, action taken or agreement made pursuant to the authority conferred by this chapter[7] shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."

In later years, the Legislature would enact several additional pieces of similar legislation regulating additional lines of insurance that had been excluded from the McBride-Grunsky Act. Each time it included a similar immunity provision. First, in 1951, acting to address concerns that workers' compensation insurers working in concert might be subject to federal antitrust prohibitions, the Legislature enacted workers' compensation insurance legislation paralleling the McBride-Grunsky Act. (Ins. Code, §§ 11750–11759.2; *State Fund*, *supra*, 24 Cal.4th at pp. 939–940.) The legislation included new Insurance Code section 11758, modeled on section 1860.1: "No act done, action taken or agreement made pursuant to the authority conferred by this article shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance." (Ins. Code, § 11758.) And in 1963, as part of a new article in the Insurance Code (§§ 795–795.7) aimed at improving insurance options for the elderly, the Legislature enacted Insurance Code section 795.7: "No act done, action taken or agreement made pursuant to the

---

[7]    Division 1, part 2, chapter 9 of the Insurance Code (former §§ 1850–1860.3), i.e., the chapter added by the McBride-Grunsky Act.

authority conferred by this article shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."

Finally, in 1973, the Legislature turned to title insurance. Because the McBride-Grunsky Act expressly exempted this category (Ins. Code, § 1851, subd. (d)), title insurance rates were to that point unregulated.[8]  With title insurers facing suits alleging state antitrust violations, the industry sponsored a measure that would extend McBride-Grunsky-Act-style rate regulation to title insurance, while supplying, as the McBride-Grunsky Act had, future immunity from antitrust liability for certain concerted actions.[9]  To that end, the Legislature largely copied the same immunity language it had used in the McBride-Grunsky Act and subsequent legislation.[10]

---

[8]  See Department of Finance, Enrolled Bill Report on Senate Bill No. 1293 (1973–1974 Reg. Sess.) prepared for Governor Reagan (Sept. 25, 1973) page 1; Legislative Analyst, analysis of Senate Bill No. 1293 (1973–1974 Reg. Sess.) as amended August 27, 1973, page 1.

[9]  See Assembly Finance & Insurance Committee, analysis of Senate Bill No. 1293 (1973–1974 Reg. Sess.) as amended August 27, 1973; Senator George N. Zenovich, author of Senate Bill No. 1293 (1973–1974 Reg. Sess.) letter to Governor Ronald Reagan, September 18, 1973, page 1; Assistant Legislative Counsel Sean E. McCarthy, California Land Title Association, letter to Governor Ronald Reagan re Senate Bill No. 1293 (1973-1974 Reg. Sess.) September 17, 1973, pages 1, 3, 5.

[10]  As originally introduced, the legislation extended immunity to acts authorized under the title insurance chapter. (Sen. Bill No. 1293 (1973–1974 Reg. Sess.) as amended Aug. 27, 1973, § 15.)  Shortly before final passage, the provision was

As this history reveals, and as numerous courts have observed over time, the language of these statutes was originally drafted to ensure that insurers would not be subject to antitrust liability for consulting with each other before establishing their rates. (See State Deputy Ins. Comr. J. R. Maloney, letter to Governor Earl Warren re Sen. Bill No. 1572, *supra*, June 10, 1947, pp. 1–2; Deputy Atty. Gen. Harold B. Haas, interdepartmental communication to Governor Earl Warren re Sen. Bill No. 1572 (1947 Reg. Sess.) June 11, 1947, pp. 3, 13; *State Fund*, *supra*, 24 Cal.4th at pp. 938–940; *Fogel v. Farmers Group, Inc.*, *supra*, 160 Cal.App.4th at p. 1410; *Donabedian v. Mercury Ins. Co.*, *supra*, 116 Cal.App.4th at p. 990.) The available committee reports concerning section 12414.26

_____

amended to narrow immunity to only those acts authorized by specific articles: "No act done, action taken, or agreement made pursuant to the authority conferred by Article 5.5 (commencing with Section 12401) or Article 5.7 (commencing with Section 12402) of this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this state heretofore or hereafter enacted which does not specifically refer to insurance." (Sen. Bill No. 1293 (1973–1974 Reg. Sess.) as amended Sept. 10, 1973, § 15.)

As noted above (*ante*, p. 6), in 1988, voters passed Proposition 103, an initiative that discarded much of the original McBride-Grunsky Act and replaced it with a drastically revised insurance rate regulation scheme. (See generally *20th Century Ins. Co. v. Garamendi*, *supra*, 8 Cal.4th at pp. 239–246; *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 812–813; *MacKay v. Superior Court*, *supra*, 188 Cal.App.4th at pp. 1445–1446.) But the McBride-Grunsky Act's exemption for title insurance was left in place (see Ins. Code, §§ 1851, subd. (d), 1861.13; *Calfarm Ins. Co.*, at p. 812, fn. 1), and so these reforms did not alter the framework for title insurance rate regulation, which remains subject to the McBride-Grunsky-Act-style rules specific to title insurance adopted in 1973.

express a parallel purpose — to extend the same McBride-Grunsky-Act-style rate regulation to title insurance while permitting the use of industry rating organizations and the exchange of loss experience data. (Sen. Ins. & Financial Insts. Com., analysis of Sen. Bill No. 1293 (1973–1974 Reg. Sess.) as amended June 12, 1973, pp. 2–3; Assem. Financial & Ins. Com., analysis of Sen. Bill No. 1293, *supra*, as amended Aug. 27, 1973; Dept. of Insurance, analysis of Sen. Bill No. 1293 (1973–1974 Reg. Sess.) as amended Aug. 27, 1973; Sen. George N. Zenovich, author of Sen. Bill No. 1293, letter to Governor Ronald Reagan, *supra*, Sept. 18, 1973, p. 1.)

Read against the backdrop of this history, section 12414.26 is best understood as an effort to reconcile the tension between what is explicitly allowed by articles 5.5 (Ins. Code, § 12401 et seq.) and 5.7 (Ins. Code, §12402 et seq.) and what is potentially disallowed by other noninsurance statutes, most prominently the Cartwright Act and other antitrust acts. It creates a safe harbor for actions authorized by articles 5.5 and 5.7 and harmonizes title insurance law with background state laws governing business competition and other matters. The history offers no hint that either section 12414.26 or its predecessor immunity provisions were ever thought to categorically immunize all ratemaking activity — even unauthorized activity — from suit.

Finally, we may consider the views of the Insurance Commissioner himself. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 (*Yamaha*) ["an agency's interpretation [of a statute] is one among several tools available to the court"].) The Commissioner is charged by statute with enforcing compliance with the title insurance ratemaking scheme. (See Ins. Code, §§ 12414.13–12414.31.)

For decades, the Commissioner has consistently maintained the view that section 12414.26 and its parallel statutes do not immunize against civil suit the charging of unauthorized rates, but rather are aimed at concerted activities that would otherwise be susceptible to challenge under the antitrust laws. (See, e.g., *State Fund, supra*, 24 Cal.4th at p. 940 [relating and giving weight to this position in the context of Ins. Code, § 11758 immunity]; *Donabedian v. Mercury Ins. Co., supra*, 116 Cal.App.4th at p. 990 [same, in the context of § 1860.1 immunity]; Gen. Counsel Adam Cole, Dept. of Ins., letter to Chief Justice Ronald M. George, Nov. 19, 2010, pp. 2–3 [presenting Commissioner's position that statutes do not immunize against civil suits challenging individual insurer's rates]; *id.* at pp. 3–4 [recounting repeated instances of previous Commissioners taking the same view as far back as 1991].) Acting as an amicus curiae in this case, the current Commissioner maintains the same position, urging that section 12414.26 was intended only to afford "immunity for certain types of concerted ratemaking activity that would otherwise be subject to the Cartwright Act or other antitrust laws" and should not be read to immunize the charging of unfiled rates.

These views do not bind us; questions of statutory interpretation are ultimately for this court to decide. (E.g, *Association of California Ins. Companies v. Jones* (2017) 2 Cal.5th 376, 389–390.) But the Commissioner's interpretation of section 12414.26 is, like interpretive rules generally, due weight and respect insofar as contextual factors suggest that the interpretation rests on institutional expertise giving the Commissioner a " 'comparative interpretive advantage' " and that the interpretation is " 'probably correct.' " (*Yamaha, supra*, 19 Cal.4th at p. 12.) Here, the Commissioner's view is

consistent and long-standing, having been maintained by five different Commissioners across a period stretching back nearly 30 years. It has roots in an even longer period of experience overseeing the mechanisms for enforcing insurers' ratemaking and rate-filing obligations. Such a history justifies treating the Commissioner's position with considerable respect. (See *Ste. Marie v. Riverside County Regional Park & Open-Space Dist.* (2009) 46 Cal.4th 282, 292–293; *Yamaha*, at pp. 13, 14.) The Commissioner's views, moreover, draw on the best evidence available from the statutory text and legislative history and align with the conclusions logically inferable from those sources (see *Yamaha*, at p. 14 [the soundness of an agency's reasoning adds to its power to persuade]). The Commissioner's views thus reinforce our conclusion that section 12414.26 does not immunize title insurers from suits based on the charging of unfiled rates.

Villanueva, the Commissioner, and other amici curiae urge us to hold more broadly that section 12414.26 immunizes insurers *only* against antitrust liability for concerted actions. Their argument raises interpretive questions unnecessary to the resolution of this case, and we do not decide them here. (See *Fogel v. Farmers Group, Inc.*, *supra*, 160 Cal.App.4th at p. 1416 [declining to decide whether immunity extended only to concerted action because even under a broader reading the challenged action was manifestly not within the statutory immunity].)[11] Even if the immunity granted by section 12414.26

---

[11]  Concerning the parallel language in a sister statute, the Court of Appeal has observed:  "[W]hile the initial motivation behind Insurance Code section 1860.1 may have been exemption

extends beyond antitrust laws, nothing in the text, surrounding scheme, or legislative history supports extending the provision to immunize what article 5.5 itself expressly prohibits.

**B.**

Fidelity offers several additional arguments in favor of its expansive reading of section 12414.26, but none is persuasive.

First, like the Court of Appeal, Fidelity relies on language in *Quelimane, supra,* 19 Cal.4th 26. In *Quelimane,* this court reversed a determination that section 12414.26 barred an action based on conspiracy to refuse to issue title insurance policies for certain categories of properties. We explained that the scope of section 12414.26 immunity is limited to actions taken under articles 5.5 and 5.7 and, generally speaking, "Article 5.5 applies only to rate regulation, article 5.7 only to advisory organizations which supply data related to ratemaking." (*Quelimane,* at pp. 44–45.) Because the "Court of Appeal did not consider the restriction to ratemaking-related activities in Insurance Code section[] 12414.26," it erroneously extended the statutory immunity to an agreement (a conspiracy not to issue policies at all) entirely unrelated to ratemaking. (*Quelimane,* at p. 46.)

Fidelity argues that our description of section 12414.26 as restricted to ratemaking-related activities should control the outcome here. After all, Fidelity contends, charging unfiled

_____

from antitrust laws in particular, it was recognized [at the time of enactment] that the language of the exemption was, in fact, broader." (*MacKay v. Superior Court, supra,* 188 Cal.App.4th at p. 1445.) Neither Villanueva nor the Commissioner addresses whether the language of section 12414.26 sweeps more broadly than concerted action, and we do not attempt to resolve the issue here.

rates is an activity related to ratemaking, even if it is not an "act done . . . pursuant to the authority conferred by" the ratemaking provisions of article 5.5 or 5.7. (§ 12414.26.) Fidelity's argument overreads *Quelimane* by a fair stretch. *Quelimane* did not purport to cast aside the actual terms of the statute. It merely identified a necessary condition for immunity — that the challenged act, action, or agreement relate to ratemaking, as do articles 5.5 and 5.7 — without offering a comprehensive overview of section 12414.26 immunity. *Quelimane*'s truncated description was more than adequate for purposes of that case, because even when discussed in that fashion, it was apparent that the scope of these articles (loosely speaking, ratemaking) and the allegations of the *Quelimane* complaint (a conspiracy not to issue policies) did not overlap. There was no need to describe the conduct immunized by section 12414.26 with any greater precision.

Even so, Fidelity would read *Quelimane* as establishing not just a necessary condition for immunity, but a sufficient one: so long as the alleged conduct relates to ratemaking in some way, it automatically is immunized by section 12414.26. It is simply a logical fallacy to infer from *Quelimane*'s holding — if conduct does not relate to ratemaking, it cannot be immunized by section 12414.26 — that if conduct does relate to ratemaking, it necessarily is immunized by section 12414.26. *Quelimane* said no such thing, and overreading it in this fashion would lead to results *Quelimane* surely did not intend.

Consider, for example, the case of an insurer that deviates from its filed rates to impose higher rates for African-Americans seeking title insurance for home purchases in particular neighborhoods. Such a policy would surely relate to ratemaking: The insurer effectively has two rate schedules, one for African-

Americans and another for those of other races. Such a policy would also be clearly illegal — not only under general antidiscrimination laws like the Unruh Civil Rights Act and the Fair Employment and Housing Act, but also under article 5.5 itself. (Civ. Code, § 51 [prohibiting racial discrimination in the provision of services by businesses]; Gov. Code, § 12955, subds. (d), (i) [prohibiting racial discrimination by businesses engaged in real estate transactions]; Ins. Code, § 12401.3, subd. (a) ["Rates shall not be . . . unfairly discriminatory"].) Under Fidelity's view of section 12414.26 immunity, the illegality would make no difference; a consumer aggrieved by the discriminatory rate could not sue. *Quelimane* is not fairly read to establish such a rule, particularly in the face of clear textual and historical indications that section 12414.26 immunity was intended to have a much more limited reach.

Fidelity, like the Court of Appeal, also invokes *Walker v. Allstate Indemnity Co.* (2000) 77 Cal.App.4th 750 and *MacKay v. Superior Court*, *supra*, 188 Cal.App.4th 1427 in support of its proposed reading of section 12414.26. (See *Villanueva v. Fidelity National Title Co.*, *supra*, 26 Cal.App.5th at pp. 1120–1124.) Those cases, however, involved challenges to certain insurance rates that were actually filed with and approved by the Commissioner. Specifically, after Proposition 103, insurers were required to file automobile insurance rate applications with the Commissioner and await approval before imposing them. (Ins. Code, § 1861.05; see *Calfarm Ins. Co. v. Deukmejian*, *supra*, 48 Cal.3d at p. 813.) In *Walker* and *MacKay*, the insurers had done so, but were nevertheless being sued for charging these filed and approved rates. The Courts of Appeal concluded the governing immunity statute, section 1860.1, "must bar claims based upon an insurer's charging a rate that has been approved

by the commissioner." (*Walker*, at p. 756; see *MacKay*, at p. 1449 [finding "no tort liability for charging a rate that has been approved by the commissioner"].)

Unlike the automobile insurance rates at issue in *Walker* and *MacKay*, title insurance rates need not receive formal approval from the Commissioner, but need only be filed in order to become, after a waiting period, effective. (See Ins. Code, §§ 12401.1, 12401.2, 12401.7.) But as the trial court and Court of Appeal concluded, Fidelity did not fulfill even these lesser responsibilities: It did not establish or file certain rates, identify the services covered by others, or hold off charging rates until after they became effective, and so "failed to comply with sections 12401.1, 12401.2, and 12401.7." (*Villanueva v. Fidelity National Title Co.*, *supra*, 26 Cal.App.5th at p. 1126.) For this reason, neither *Walker* nor *MacKay* can help Fidelity's case. (See *MacKay v. Superior Court*, *supra*, 188 Cal.App.4th at p. 1449 [distinguishing "cases [in which] the underlying conduct was *not* the charging of an approved rate"]; *Donabedian v. Mercury Ins. Co.*, *supra*, 116 Cal.App.4th at p. 992 [distinguishing *Walker* as involving "a challenge to approved rates"].)

Finally, Fidelity raises a practical argument. It notes that section 12414.26 supplies not just immunity from liability but immunity from suit. (See § 12414.26 [acts that are the subject of immunity shall not "constitute . . . grounds for prosecution or civil proceedings"].) Fidelity argues that for any such immunity to be meaningful, it must always be demonstrable at the earliest possible opportunity, i.e., on demurrer. From this premise, Fidelity argues that the substantive standard for when immunity applies must be defined in such a way that its application can be determined at a glance from the pleadings —

25

an imperative that argues in favor of extending immunity to all acts connected with ratemaking.

The argument rests on a flawed premise. That the Legislature granted insurers immunity from suit for certain acts does not excuse insurers, as the parties claiming entitlement to that protection, from having to demonstrate, with evidence if necessary, that the preconditions for its invocation have been met. Qualified immunity, for example, likewise supplies "an *immunity from suit* rather than a mere defense to liability." (*Mitchell v. Forsyth* (1985) 472 U.S. 511, 526.) But the immunity attaches only once its basis is apparent; allegations that would defeat qualified immunity will allow suit to proceed, and dismissal may in some cases not occur until a motion for summary judgment (see *ibid.*) or later (see, e.g., *Johnson v. Jones* (1995) 515 U.S. 304, 317–320 [denying interlocutory review of summary judgment denial that required defendants asserting qualified immunity to go to trial]; *Harlow v. Fitzgerald* (1982) 457 U.S. 800, 819–820 [remanding for lower court to determine whether, in face of claimed qualified immunity, case could go to trial]). That section 12414.26 includes language establishing a broad procedural protection offers no basis to disregard other language in the statute, limiting immunity to any "act done, action taken, or agreement made" pursuant to specific statutory sources of authority (§ 12414.26), that more narrowly defines the universe of conduct to which it applies. Even so construed, section 12414.26 still provides a basis for bringing a lawsuit to a prompt end, once the statutory prerequisites have been shown.

## IV.

We turn to Fidelity's alternative argument that Villanueva's lawsuit is barred because a proceeding before the Commissioner is a consumer's exclusive remedy for the charging of an unfiled rate. Notably, Fidelity disavows any argument that this statutory administrative proceeding must be exhausted before filing a suit in superior court or that a superior court should refer such a suit to the Commissioner under the doctrine of primary jurisdiction.[12] Fidelity's argument about the role of administrative proceedings is considerably broader. Focusing our attention on this broad alternative argument for affirmance, we agree with Villanueva and the Commissioner that administrative proceedings are not a ratepayer's exclusive remedy for the charging of an unfiled rate.

Article 6.7 (Ins. Code, §§ 12414.13–12414.19) of the chapter covering title insurance provides for administrative

---

[12] When primary jurisdiction applies, an initial suit in court is permitted, although the trial court may thereafter choose to stay the action and solicit an agency's views. (*Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 931–933; *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390–392.) When exhaustion applies, a party must pursue an administrative remedy initially, but may thereafter file suit in court. (*Jonathan Neil*, at pp. 930–931; *Farmers Ins. Exchange*, at p. 390.) When a statutory regime vests exclusive jurisdiction in an agency, in contrast, a party may only proceed administratively and thereafter may only challenge the results of any administrative outcome through administrative mandamus (Code Civ. Proc., § 1094.5) or such other means as the statutory scheme may specify (see, e.g., Lab. Code, § 1700.44, subd. (a) [exclusive jurisdiction vested in the Labor Commissioner, with review by way of trial de novo in superior court]).

proceedings before the Commissioner in the event of disputes over charged rates or rating plans or systems. First, a "person aggrieved by any rate charged . . . by a title insurer . . . may request such person or entity to review the manner in which the rate, plan, system, or rule has been applied with respect to insurance or services afforded him. Such request . . . shall be written." (*Id.*, § 12414.13.) If unable to obtain satisfaction from the insurer, the aggrieved consumer may then turn to the Commissioner: "Any person aggrieved by the action of any such person or entity in refusing the review requested, or in failing or refusing to grant all or part of the relief requested, may file a written complaint and request for hearing with the commissioner, specifying the grounds relied upon." (*Ibid.*) Under this provision, a written complaint to the regulated entity is a necessary prerequisite to a written complaint to the Commissioner; it is only if the written complaint fails that a person is "aggrieved" and entitled to seek a hearing with the Commissioner. (*Ibid.*) But nothing in either Insurance Code section 12414.13 or the remainder of article 6.7 suggests that a complaint to the Commissioner is exclusive of any other remedy that might be available to the consumer, including remedies otherwise available in judicial proceedings.[13]

---

[13] Fidelity further notes that other parts of the statutory scheme give the Commissioner additional responsibilities for interpreting and enforcing the rate-filing requirements of the title insurance chapter. For example, Insurance Code section 12340.7 gives the Commissioner the authority to promulgate regulations identifying certain "miscellaneous charges" that are not subject to regulation as rates. But nothing about this grant of rulemaking authority implies exclusive jurisdiction over consumer claims based on failure to comply with the relevant provisions of the title insurance law.

The language in Insurance Code section 12414.13 contrasts with that of other schemes where the Legislature has made manifest its intent to establish an exclusive administrative remedy. For example, the Talent Agencies Act (Lab. Code, §§ 1700–1700.47) regulates relations between artists in Hollywood and those who represent them (see *Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 984–985). A provision of the act requires that disputes under it be submitted in the first instance to the Labor Commissioner: "In cases of controversy arising under this chapter, the parties involved *shall* refer the matters in dispute to the Labor Commissioner, who shall hear and determine the same, subject to an appeal within 10 days after determination, to the superior court where the same shall be heard de novo." (Lab. Code, §1700.44, subd. (a), italics added.) This language, using the mandatory "shall," grants "original and exclusive jurisdiction over issues arising under the Act" to the Labor Commissioner. (*Marathon Entertainment, Inc.*, at p. 981, fn. 2; see *Styne v. Stevens* (2001) 26 Cal.4th 42, 54–56.)

The state's workers' compensation scheme is to similar effect. The Legislature has set out an administrative procedure for injured workers to file for and obtain compensation for workplace injuries. (Lab. Code, §§ 3200–6149; see Cal. Const., art. XIV, § 4 [authorizing the Legislature to establish and vest an administrative body with jurisdiction "to determine any dispute" arising under the workers' compensation law].) The statutory scheme expressly makes that compensation, in the cases where it is available, "the exclusive remedy" for such injuries. (Lab. Code, § 3601, subd. (a); see *id.*, § 3602, subd. (a) ["sole and exclusive remedy"].) The scheme also explicitly provides that "[a]ll the following proceedings shall be instituted

before the [Workers' Compensation Appeals Board] and not elsewhere," including claims seeking compensation, to enforce liability for compensation, and so on. (*Id.*, § 5300; see *King v. CompPartners, Inc.* (2018) 5 Cal.5th 1039, 1056–1057.) Through the use of such express language, the Legislature has ousted superior courts of jurisdiction and granted the Workers' Compensation Appeals Board "exclusive jurisdiction to determine the extent of recovery for an injury" covered by the workers' compensation scheme. (*Unruh v. Truck Insurance Exchange* (1972) 7 Cal.3d 616, 624.)

The language of these statutes shows that the Legislature knows how to prescribe exclusivity when it so intends. The Legislature used no comparable language here. In describing a consumer's right to file a complaint with the Commissioner, the Legislature used the permissive "may" rather than the mandatory "shall." (See Ins. Code, § 16 [governing interpretation of the two terms].) And the Legislature included no other language expressly making proceedings before the Commissioner the exclusive avenue of recourse. In the absence of such language, we infer the Legislature did not intend such a result.

In evaluating whether a remedial scheme was intended to be exclusive, we may also consider the scope of the recourse it affords. We have said that exhaustion of a remedy prior to pursuing a civil suit — never mind, as Fidelity urges here, exclusivity — may not be required if the relief available is materially incomplete. (See *Ramos v. County of Madera* (1971) 4 Cal.3d 685, 691 [" 'The rule that a party must exhaust his administrative remedies prior to seeking relief in the courts "has no application in a situation where an administrative remedy is unavailable or inadequate" ' "].) Of course, we do not doubt the

Legislature has the power to limit aggrieved parties to an administrative forum, even if that forum is incapable of supplying a make-whole remedy. But an incomplete remedial scheme offers some indication as to whether the Legislature intended the administrative forum to serve as an exclusive path to relief.

Here, Villanueva seeks restitution on a classwide basis, but as Villanueva notes (and the Commissioner agrees), the statutory scheme grants the Commissioner no power to issue restitution to aggrieved individual consumers, never mind a class of them. The only relief the Commissioner can provide is an order prohibiting the unlawful rate or suspending or revoking the insurer's license. (See Ins. Code, §§ 12414.16, 12414.17; *State Fund, supra*, 24 Cal.4th at p. 938 [noting the Ins. Code contains no provision authorizing the Commissioner to order refunds to insureds of improper charges].) To interpret article 6.7 as supplying consumers' sole avenue of recourse would leave them unable to obtain restitution of, or have the insurer disgorge, illegal overcharges. It would, as the Commissioner argues, undermine the stated overarching goal of ensuring that insurers do not impose excessive or unfairly discriminatory rates. (Ins. Code, § 12401.) In some cases where a violation is too minor to warrant a license suspension, exclusivity would eliminate any effective deterrent, and in other cases where a suspension is imposed, the absence of restitution would render any remedy incomplete. For this reason, the Commissioner in his briefing urges that "private enforcement is an important complement to the Department[ of Insurance]'s jurisdiction and consumer protection mission."

Fidelity disputes the premise, arguing that the Commissioner does in fact have authority to order restitution in

proceedings under Insurance Code section 12414.13 et seq. Fidelity's argument rests on Insurance Code section 12414.18, which sets out the procedures to be followed when denying, suspending, or revoking an insurer's license, incorporating by reference the rules set out in Government Code sections 11500 to 11529. The statute also provides that the "commissioner shall have all the powers granted to him" in that chapter of the Government Code. (Ins. Code, § 12414.18.) Among these are the power to file an accusation (Gov. Code, §§ 11503, subd. (a), 11507), to obtain discovery (*id.*, § 11507.6), to hear a case (*id.*, § 11512), to issue a decision (*id.*, § 11517), and to certify official acts (*id.*, § 11528).

Fidelity argues that one statute in the cross-referenced chapter, Government Code section 11519.1, grants the Commissioner the power to order restitution. Fidelity's argument is unsound. While nearly every other statute in the chapter grants powers generically to any "agency," defined as every "state board[], commission[], and officer[] to which this chapter is made applicable by law" (Gov. Code, § 11500, subd. (a)), Government Code section 11519.1 is far more circumscribed: It authorizes "an order of restitution" only in a very narrow subset of proceedings, those involving a "decision rendered against a licensee under Article 1 (commencing with Section 11700) of Chapter 4 of Division 5 of the Vehicle Code"[14] (Gov. Code, § 11519.1, subd. (a)). It does not authorize any other agencies in any other proceedings to issue restitution. Had the Legislature intended the procedural rules of the chapter to include a broad grant of authority to agencies to issue

---

[14] That article pertains generally to the licensing of car dealers by the Department of Motor Vehicles.

restitution, it presumably would have used the same unlimited, generic language consistently employed elsewhere in the chapter. The Government Code and the Insurance Code provision incorporating its procedures by reference do not grant the Commissioner any power to order restitution to insureds. Fidelity offers no reason why the Legislature would have intended to consign consumers to an exclusive set of administrative remedies incapable of offering restitution for their losses; this failure to make any provision for restitutionary relief offers an additional indication that the Legislature did not intend to make administrative proceedings exclusive of all other remedies.

Turning from the specific provisions governing administrative rate proceedings before the Commissioner, Fidelity also invokes Insurance Code section 12414.29 (section 12414.29) as support for its view that these proceedings are exclusive of other remedies. Section 12414.29 provides in full: "The administration and enforcement of Article 5.5 (commencing with Section 12401) and Article 5.7 (commencing with Section 12402) of this chapter shall be governed solely by the provisions of this chapter. Except as provided in this chapter, no other law relating to insurance and no other provisions in this code heretofore or hereafter enacted shall apply to or be construed as supplementing or modifying the provisions of such articles unless such other law or other provision expressly so provides and specifically refers to the sections of such articles which it intends to supplement or modify. The provisions of this chapter and regulations adopted pursuant thereto shall constitute the exclusive regulation of the conduct of escrow and title transactions by entities engaged in

the business of title insurance as defined in Section 12340.3, notwithstanding any local regulation or ordinance."

Fidelity's argument rests solely on the first two sentences of the provision; we have previously explained that the third sentence, which was added to the statute some years after it was enacted, serves "to preempt local regulation, not to exempt title insurers from other state laws governing unfair business practices" (*Quelimane, supra,* 19 Cal.4th at p. 45), and so it has no bearing on the viability of Villanueva's UCL claim. According to Fidelity, the requirements that the "enforcement of Article 5.5 . . . shall be governed solely by the provisions of this chapter," and "no other law relating to insurance" shall apply absent express provision (§ 12414.29), permit administrative proceedings before the Commissioner (Ins. Code, §§ 12414.13–12414.19), but preclude enforcement of article 5.5 through any other means, including the UCL suit at issue here.

Read in isolation, the first sentence — "The administration and enforcement of Article 5.5 (commencing with Section 12401) and Article 5.7 (commencing with Section 12402) of this chapter shall be governed solely by the provisions of this chapter" — might seem to support Fidelity's view. (§ 12414.29.) But this sentence and the following sentence were enacted together and are better read and understood together. The first sentence limits administration and enforcement of articles 5.5 and 5.7 to the provisions of "this chapter," i.e., Insurance Code sections 12340 to 12418.4, the chapter specifically governing title insurance. The second sentence explains what provisions are being excluded from application: "Except as provided in this chapter, no other law *relating to insurance* and no other provisions in *this code* . . . shall apply to or be construed as supplementing or modifying the provisions of

such articles unless such other law or other provision expressly so provides and specifically refers to the sections of such articles which it intends to supplement or modify." (§ 12414.29, italics added.) In other words, the statute governs the relationship between article 5.5 and *other parts of the Insurance Code* and resolves any conflict or overlap by specifying that those provisions specific to title insurance, rather than insurance generally, should govern unless another provision of the Insurance Code explicitly specifies otherwise. Section 12414.29 does not govern the relationship between the provisions of article 5.5 and other noninsurance laws, such as the UCL.[15]

This reading of the text is supported by considering the historical background and surrounding statutory scheme. Section 12414.29 was modeled on a parallel provision in the McBride-Grunsky Act, Insurance Code section 1860.2, which provides in nearly identical terms: "The administration and enforcement of this chapter shall be governed solely by the provisions of this chapter. Except as provided in this chapter, no other law relating to insurance and no other provisions in this code heretofore or hereafter enacted shall apply to or be construed as supplementing or modifying the provisions of this

---

[15]    Fidelity urges that in section 12414.29, " '[n]o other law relating to insurance' . . . means no other law," and if "the Legislature meant to limit section 12414.29 to other provisions in the Insurance Code, it could easily and clearly have said so." But the Legislature *did* clearly say so, in the very language Fidelity quotes: "no other law *relating to insurance*" (§ 12414.29, italics added), i.e., no other insurance-specific law. When the Legislature intended to reference laws of general application from outside the Insurance Code, it used quite different language, as in sections 1860.1 and 12414.26 ("any other law . . . which does not specifically refer to insurance").

chapter unless such other law or other provision expressly so provides and specifically refers to the sections of this chapter which it intends to supplement or modify." Indeed, as originally drafted, section 12414.29 copied Insurance Code section 1860.2 verbatim (see Sen. Bill No. 1293 (1973–1974 Reg. Sess.) as amended Aug. 27, 1973, § 15), although it was later amended to confine its scope to the administration of specific articles rather than the entire title insurance chapter (Sen. Bill No. 1293 (1973–1974 Reg. Sess.) as amended Sept. 10, 1973, § 15).

Section 1860.2 immediately follows section 1860.1, which, as already discussed, served as a kind of template for the immunity provision in section 12414.26. (*Ante*, pp. 15–17.) Considered side-by-side, sections 1860.1 and 1860.2 are naturally read to regulate distinct spheres. Section 1860.1 governs the interplay between the insurance chapter and other noninsurance laws. (*Ibid.* [actions authorized under the chapter shall not constitute violations of any state law "which does not specifically refer to insurance"].) Section 1860.2, in contrast, deals with the interplay between the insurance chapter and other insurance-specific laws. (*Ibid.* ["no other law relating to insurance and no other provisions in this [Insurance C]ode" shall apply unless it expressly references the provisions of the chapter it is intended to supplant].)

We conclude the same is true of sections 12414.26 and 12414.29. While the former deals with the interplay between articles 5.5 and 5.7 and noninsurance laws, the latter deals with the interplay between those articles and insurance-specific laws. This understanding attends to the textual differences in phrasing — one set of statutes specifically deals with laws "relating to insurance" (Ins. Code, §§ 1860.2, 12414.29), while the other set deals with laws that "do[] not specifically refer to

insurance" (§§ 1860.1, 12414.26). It also prevents these statutes from duplicating each other. If section 12414.29 (and Ins. Code, § 1860.2) were understood to forbid not only application of other insurance laws, but also other noninsurance laws, then section 12414.26 (as well as § 1860.1) would be superfluous.

To the extent section 12414.29 is ambiguous, we consider the Commissioner's view that this provision does not foreclose suits under noninsurance laws. An administrative agency's interpretation of statutes regulating the extent of its power and responsibilities is entitled to a measure of respect (*Ste. Marie v. Riverside County Regional Park & Open-Space Dist.*, *supra*, 46 Cal.4th at p. 292; see *Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 937 ["The fact that the Commissioner does not view the trial court as having poached into the Commissioner's statutory domain is clearly significant, and we defer to his interpretation of his authority"]), and so we accord weight to the Commissioner's view that section 12414.29 does not render his powers to enforce article 5.5 exclusive.

Finally, Fidelity looks to case law in search of support for its exclusivity argument, but its search turns up empty. Fidelity notes that in *Chicago Title Ins. Co. v. Great Western Financial Corp.*, *supra*, 69 Cal.2d at page 323, an antitrust case, this court observed in passing that "rate regulation has traditionally commanded administrative expertise" and held allegations an insurer was charging below-cost rates to harm competition were subject to demurrer because "a court is not the appropriate initial arbiter of factors involved in insurance costs." But we made these observations in a very different context, a complaint that alleged illegal below-cost pricing, and thus asked courts to weigh in on whether an insurer's rates exceeded its costs. As we explained in *Manufacturers Life Ins. Co. v. Superior Court*

(1995) 10 Cal.4th 257, *Chicago Title* stands for the proposition that state antitrust and unfair competition law may in some instances be superseded, but only to the extent "specific provisions of the Insurance Code . . . authorize some practices and as to others [give] the Insurance Commissioner authority to determine the propriety of the conduct." (*Id.* at p. 272.) *Krumme v. Mercury Ins. Co.*, *supra*, 123 Cal.App.4th 924 and *Donabedian v. Mercury Ins. Co.*, *supra*, 116 Cal.App.4th 968 are likewise to no avail. Although Fidelity cites these cases in passing as supporting exclusive original jurisdiction for the Commissioner, neither found such exclusive jurisdiction for the claims there at issue (challenges to an auto insurer using broker-agents and withholding discounts based on a lack of past insurance, respectively), and neither contains any reasoning or analysis that would support exclusive original jurisdiction here.

The Legislature, in crafting the various provisions of the scheme regulating title insurance, has made the relevant decisions concerning the appropriate spheres for courts and the Commissioner. The text of the provisions it chose to adopt does not extend administrative exclusivity to circumstances in which a rate was required to be filed with, but was never filed with, the Commissioner. Nothing in the statutory scheme forecloses a court from considering a claim that an insurer failed to meet its threshold obligation to file a rate and then charged the rate anyway.

## V.

The Insurance Code required Fidelity to file its rates with the Insurance Commissioner before charging consumers, but it failed to do so. Charging an unfiled rate is not an "act done . . . pursuant to the authority conferred by" Insurance Code section

12401 et seq. (§ 12414.26).  It is a violation of the express terms of the Insurance Code, for which Fidelity enjoys no statutory immunity from suit under section 12414.26.  Nor does any aspect of other provisions in the chapter regulating title insurance grant to the Commissioner exclusive jurisdiction to address consumer challenges to unfiled rates.  Insurance Code section 12414.13 supplies an administrative remedy, but it is not exclusive of other remedies otherwise available in the courts.  The superior court therefore did not err in ruling on the merits of Villanueva's UCL action challenging the imposition of unfiled rates.  (See *Manufacturers Life Ins. Co. v. Superior Court, supra*, 10 Cal.4th at p. 263 [the Legislature generally intended the UCL and other laws to be cumulative to the powers granted the Commissioner to sanction insurers]; *Krumme v. Mercury Ins. Co.*, *supra*, 123 Cal.App.4th at p. 936 ["The Insurance Code does not . . . displace the UCL 'except as to . . . activities related to rate setting' "].)

We reverse the Court of Appeal's judgment and remand for further proceedings not inconsistent with this opinion.

**KRUGER, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Villaneuva v. Fidelity National Title Company
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XX 26 Cal.App.5th 1092
**Rehearing Granted**

_____

**Opinion No.** S252035
**Date Filed:**  March 18, 2021
_____

**Court:**  Superior
**County:**  Santa Clara
**Judge:**  Peter H. Kirwan

_____

**Counsel:**

Chavez & Gertler, Nance F. Becker, Mark A. Chavez; The Kick Law Firm, Taras Kick, Thomas Segal; Shernoff Bidart Escheverria, Michael J. Bidart; The Bernheim Law Firm, Steven J. Bernheim, Nazo S. Semerjian; Friedman Rubin and Richard H. Friedman for Plaintiffs and Appellants.

Olivier Schreiber & Chao, Monique Olivier; Allison M. Zieve for Public Citizen and Public Justice as Amici Curiae on behalf of Plaintiffs and Appellants.

Amy Bach and Mark Dillman for United Policyholders as Amicus Curiae on behalf of Plaintiffs and Appellants.

Arkin Law Firm and Sharon J. Arkin for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Jonathan L. Wolff, Chief Assistant Attorney General, Lisa W. Chao, Karen W. Yiu and Heather B. Hoesterey, Deputy Attorneys General, Joshua A. Klein, Deputy State Solicitor General, for California Department of Insurance as Amicus Curiae on behalf of Plaintiffs and Appellants.

Harvey Rosenfield and Pamela Pressley for Consumer Watchdog, Consumer Federation of America and Consumer Federation of California as Amici Curiae on behalf of Plaintiffs and Appellants.

Hahn Loeser & Parks, Michael J. Gleason, Rupa G. Singh, Erica L. Calderas, Steven A. Goldfarb; California Appellate Law Grouop, Ben Feuer, Julia Partridge and Greg Wolff for Defendant and Appellant.

Dentons US, Ronald D. Kent, Joel D. Siegel, Sonia R. Martin and Susan M. Walker for  California Land Title Association as Amicus Curiae on behalf of Defendant and Appellant.

Arthur E. Davis III for American Escrow Association as Amicus Curiae on behalf of Defendant and Appellant.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Steven J. Benheim
The Bernheim Law Firm
11611 Dona Alicia Place
Studio City, CA 91436
(818) 760-7341

Greg Wolff
California Appellate Law Group LLP
96 Jessie St.
San Francisco, CA 94105
(415) 649-6700